

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-3-1997

# Great Western Mtg v. Peacock

Precedential or Non-Precedential:

Docket 96-5273

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Great Western Mtg v. Peacock" (1997). *1997 Decisions.* Paper 76.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/76

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

No. 96-5273

----------

GREAT WESTERN MORTGAGE
CORPORATION

v.

MICHELE PEACOCK


Appellant

----------

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 96-628)

----------

Argued Monday, December 16, 1996

BEFORE:  STAPLETON, ROTH
and GARTH Circuit Judges

----------

(Opinion filed April 3, 1997)

----------

Neil M. Mullin, Esq. (Argued)
Christopher P. Lenzo, Esq.
Smith Mullin, P.C.
200 Executive Drive, Suite 155
West Orange, New Jersey 07052

Attorneys for Appellant

1

Roger J. Hawke, Esq. (Argued)
Elizabeth B. Lynch, Esq.
Brown & Wood, LLP
One World Trade Center
New York, New York 10048

Attorneys for Appellee

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

This appeal presents the issue of whether a district court, pursuant to the Federal Arbitration Act (FAA),[1] should compel arbitration of a sexual harassment claim based on New Jersey's Law against Discrimination.

On August 8, 1994, the plaintiff, Michele Peacock, a resident of New Jersey, applied for work as a mortgage consultant at defendant Great Western Mortgage Corporation, which was incorporated in Delaware. At the time of her application, but before she had been employed, she signed a Certification agreeing:

> to submit any dispute related to my employment, or the termination of my employment, to final and binding arbitration (thus waiving any right to pursue any other administrative and/or legal proceeding), and, as a condition of my employment, **I agree to sign Great Western's Arbitration Agreement upon commencement of my employment, and to abide by the Arbitration Agreement and Great Western's Binding Arbitration Policy and Procedures.**[2]

----

1. 9 U.S.C. § 1 et seq.

2. App. at 22a (emphasis in original).

2

On September 1, 1994, Great Western employed Peacock and she began work.  Thereafter, on September 26, 1994, Peacock signed a more detailed form entitled "Great Western Financial Corporation and Affiliates Binding Arbitration Agreement" (Arbitration Agreement).  The Agreement required arbitration of all employee discrimination claims, including statutory claims and claims based on sex.  It provided for binding arbitration in all employment-related disputes, including:

> all civil claims, excluding claims under the Workers' Compensation Act, but including, and not limited to, claims of employment discrimination on the basis of race, sex, age, religion, color, national origin, disability and veteran status (including claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act and any other local, state or federal law concerning employment or employment discrimination), claims based on public policy, statutory claims and claims against individuals or other entities.[3]

The Agreement further provided that arbitration had to be initiated within one year after an event giving rise to a dispute, and that an employee involved in an arbitration could be represented by an attorney, at her own expense.  Finally, the Agreement provided that the arbitrator could not award punitive or exemplary damages.

According to Peacock, sometime after she commenced employment she became the object of sexual harassment.  She alleges that her supervisor at Great Western, William Belott,

---

3. Id. at 32a.

3

made unwelcome advances toward her and threatened reprisal in the event that she discussed his behavior with others.[4]  In addition, she claims that the Branch Manager, Alice Morris, knew of Belott's advances but failed to take any action against him, and that Morris herself made inappropriate comments and suggestions.[5]

Peacock retained counsel to represent her in pressing a claim for sexual harassment.[6]  In May 1995 her attorney made Great Western aware of Peacock's complaints, and in August 1995 Great Western responded that after conducting an investigation, it "was unable to confirm" her allegations.  Great Western advised Peacock that if she was not satisfied with the results of Great Western's investigation, she could "file a claim in arbitration, pursuant to the Binding Arbitration Agreement . . . dated 9/26/94."  On August 23, 1995, Peacock's counsel filed for arbitration on Peacock's behalf.

Pursuant to the Arbitration Agreement, Great Western submitted the matter to JAMS/ENDISPUTE (JAMS), and on October 9, 1995, JAMS confirmed that it had received the request to arbitrate.[7]  In the interim, however, Peacock retained another

---

4. See Complaint and Jury Demand in Michele Peacock v. Great Western Mortgage Corporation et al., Superior Court of New Jersey Law Division: Essex County, No. L-13441-95,  App. at 54a-56a.

5. Id. at 56a-57a.  Morris is alleged to have told Peacock, "If you aren't getting any deals from your realtors, walk in with your skirt over your head; I bet you get business then," and to have ordered Peacock to kiss an appraiser.  Id.

6. Great Western asserts that Peacock retained the law firm Hannoch Weisman in January of 1995.

7. App. at 140a.

4

attorney, whose fees, apparently, were lower than the fees charged by Hannoch Weisman. On October 25, 1995, her new counsel informed Great Western that "we hereby withdraw all settlement offers and that we do not consent to arbitration of this matter."

On November 8, 1995, pursuant to the New Jersey Law against Discrimination (NJLAD), N.J.S.A. 10:5-1 et seq., Peacock filed a complaint against Great Western and supervisors Belott and Morris. In the complaint, which was filed in the Superior Court of New Jersey, Peacock sought money damages as well as declaratory and injunctive relief. In its answer, filed on January 30, 1996, Great Western responded, inter alia, that the dispute came within the purview of a binding arbitration agreement and that Peacock had waived any right she might have had to a trial.

On February 1, 1996, Great Western filed a petition under the FAA in the District of New Jersey to compel arbitration and to stay the state proceedings. On April 9, 1996, the district court issued an Order compelling arbitration and granting the stay.[8]

Peacock appeals from that order, contending 1) that the FAA does not apply to employment contracts; 2) that she did not waive her rights under NJLAD; 3) that because Great Western's Arbitration Agreement would deprive Peacock of a two-year statute of limitations, a right to discovery, and punitive damages, it is void as a matter of public policy; 4) that Great Western waived

_____
8. Great Western Mortgage Corp. v. Peacock, No. 96-0268, Order of April 9, 1996 (D.N.J. 1996).

5

any right to arbitration that it might have had; and 5) that the district court erred in denying her motion for a jury trial under 9 U.S.C. § 4.

Great Western filed the petition to compel arbitration pursuant to 9 U.S.C. § 4, which provides:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

The district court had diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, and we have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.[9] The district court's decision is subject to plenary review.[10] We affirm.

## I.

Peacock argues first that the district court erred in compelling arbitration of her claim because the FAA does not apply to employment contracts. She maintains that she falls within the scope of the exceptions to mandatory arbitration provided in the FAA.

Section 1 of the FAA provides as follows:

---

9. *Trap Rock Industries, Inc. v. Local 825, International Union of Operating Engineers, AFL-CIO*, 982 F.2d 884, 887 (3d Cir. 1992).

10. *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1065 (3d Cir. 1995).

6

"Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but <u>nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.</u>"[11]

(emphasis added).

Peacock contends that this court has construed the FAA to exclude mandatory arbitration of employment contracts.

We cannot agree. In <u>Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America,</u>[12] we held, after an analysis of the relevant legislation, that the exceptions specified in 9 U.S.C. § 1 refer only to workers actually engaged in interstate commerce.[13] <u>Tenney</u> involved an employer and

---

11. 9 U.S.C § 1.

12.  207 F.2d 450 (3d Cir. 1953)(en banc).

13. <u>Id.</u> at 452.

7

employees engaged in the manufacture of goods for sale in interstate commerce. The company's employees, who were represented by a labor union, were all engaged in the manufacture of these goods and in incidental plant maintenance. The collective bargaining agreement between the company and the union contained an arbitration clause. The company, claiming that a strike by its employees violated the collective bargaining agreement, brought suit in the district court for the District of New Jersey under Section 301 of the Labor Management Relations Act. The union moved for a stay of the suit, pending arbitration under Title 9.

The district court denied the stay and refused to compel arbitration. In vacating the district court's judgment, Judge Maris, writing for this court, held that the employees were <u>not included</u> within the class of those excepted from the operation of the FAA, and hence were required to arbitrate their disputes:

> In the case before us the plaintiff's employees are engaged in the production of goods for subsequent sale in interstate commerce. Thus while their activities will undoubtedly affect interstate commerce they are not acting directly in the channels of commerce itself. They are, therefore, not a "class of workers engaged in . . . interstate commerce" within the meaning of Section 1 of title 9."[14]

Peacock, in her initial brief, makes no reference to our <u>Tenney</u> decision. Rather, Peacock argues that our later case of <u>Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>[15]

14. <u>Id.</u> at 453.

15.  7 F.3d 1110 (3d Cir. 1993).

8

holds squarely that "the FAA by its own terms does not apply to employment contracts." _Pritzker_, however, was an appeal which did not involve employment contracts. Rather, it held that the asset management contracts in that case could be subjected to arbitration.[16] Hence, even if _Pritzker_ sought to overrule _Tenney_--which it could not[17]--the holding of _Pritzker_ has no reference to employment contracts, and hence has no bearing on the issue here.

We are satisfied that _Tenney_ is still the controlling law in this Circuit as well as others. _See, e.g., Dancu v. Coopers & Lybrand_,[18] citing and following _Tenney_,[19] as well as authorities in the First, Second, Fifth, Sixth, and Seventh

---

16. _Id._ at 1120.

17. In this Circuit a published opinion can be overruled only by the court sitting en banc, and not by a subsequent panel decision. Internal Operating Procedure 9.1. _See also O.Hommel Company v. Ferro Corporation_, 659 F.2d 340, 354 (3d Cir. 1981)("Yet a panel of this court cannot overrule a prior panel precedent."), _cert. denied_, 455 U.S. 1017 (1982).

18. 778 F. Supp. 832 (E.D. Pa. 1991), _aff'd_, 972 F.2d 1330 (3d Cir. 1992).

19. _Id._ at 834.

Circuits.[20] In addition, any number of district courts have enforced arbitration agreements in employment contracts.[21] As a consequence, in this Circuit, in particular, as well as in the other Circuits which follow Tenney, the only class of workers included within the exception to the FAA's mandatory arbitration provision are those employed directly in the channels of commerce itself. Peacock does not fall within this classification. Accordingly, the district court did not err in compelling arbitration by holding that the mandatory arbitration provision of the FAA applied to Peacock's employment agreement.

## II.

Peacock also argues that the Arbitration Agreement does not bind her, because she claims to have been coerced into signing it. She claims that she was unaware of the rights she was waiving, and that her waiver was involuntary. First, because at the time she applied to work at Great Western she was not

20. See, e.g., Rojas v. TK Communications , Inc., 87 F.3d 745, 747-48 (5th Cir. 1996); Asplundh Tree Expert Co. v. Bates, 71 F.3d 592, 597-99 (6th Cir. 1995); Bacashihua v. United States Postal Service, 859 F.2d 402, 405 (6th Cir. 1988); Miller Brewing Co. v. Brewery Workers' Local Union No. 9, AFL-CIO, 739 F.2d 1159, 1162 (7th Cir. 1984), cert. denied, 469 U.S. 1160 (1985); Erving v. Virginia Squires Basketball Club, 468 F.2d 1064, 1069 (2d Cir. 1972); and Dickstein v. duPont, 443 F.2d 783, 785 (1st Cir. 1971).

21. See, e.g., Powers v. Fox Television Stations, Inc., 923 F. Supp. 21, 23-24 (S.D.N.Y. 1996)(enforcing arbitration of claims of age discrimination brought under New York State Human Rights Law); Crawford v. West Jersey Health Sys., 847 F. Supp. 1232, 1242-43 (D.N.J. 1994)(enforcing arbitration of Title VII and NJLAD claims); Cherry v. Wertheim Schroder and Co., 868 F. Supp. 830, 834-35 (D.S.C. 1994)(enforcing arbitration of Title VII and state law sexual harassment claims).

informed of the provisions of the Arbitration Agreement, although she signed the Certification agreeing to abide by arbitration. Second, she argues that neither the Arbitration Agreement itself, nor the employee handbook which details the agreement,[22] informed her of the New Jersey statutory rights she was being asked to waive. In her brief Peacock suggests that if she had been advised specifically of her rights under NJLAD, she would have sought legal advice.[23]

Peacock argues further that her waiver of statutory rights was coerced because she would not have been hired if she had not agreed to sign Great Western's Arbitration Agreement when she applied for a position with the company. She also charges that she would have been fired if she had refused to sign the Arbitration Agreement after beginning employment. We agree with the district court, however, that Peacock has neither alleged nor come forward with evidence to prove any facts that would constitute "grounds . . . at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

**A.**

In calling on the courts to resolve these matters, Peacock misunderstands the narrow scope of the inquiry involved in the arbitration process. Under the FAA the district court must be satisfied that the parties entered into a valid

22. Great Western claims to have provided Peacock with a copy of the employee handbook, but Peacock denies having received it.

23. Appellant's Brief at 21-22.

11

arbitration agreement. In conducting this inquiry the district court decides only whether there was an agreement to arbitrate, and if so, whether the agreement is valid. 9 U.S.C. § 2. In so deciding, the district court is not to consider the merits of the claims giving rise to the controversy, but is only to determine, as we have stated, whether there is a valid agreement to arbitrate. Once such an agreement is found, the merits of the controversy are left for disposition to the arbitrator.[24] Moreover, there is a strong presumption in favor of arbitration, and doubts "concerning the scope of arbitrable issues should be resolved in favor of arbitration."[25]

**B.**

The district court here held that Peacock and Great Western had agreed to arbitrate, and that Peacock's claims fall within the scope of the Arbitration Agreement. The record discloses that Peacock effectively agreed to arbitration on three occasions: first, as a condition of her employment by Great Western, she agreed to sign the Arbitration Agreement upon beginning employment. Second, she then signed the Arbitration Agreement itself, after she was employed. Finally, after about

---

24. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967).

25. Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25 (1983); see also Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985)("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

12

one year of employment, on August 23, 1995, Peacock's attorney initiated arbitration by invoking the Arbitration Agreement, when he filed for arbitration on her behalf.

The record reveals that Peacock was a college graduate, having received a Bachelor of Science degree in Business Administration after four and one-half years of college. She does not contend that she failed to read the document containing the Arbitration Agreement, or that she had not read the arbitration provisions. Indeed, Peacock had no reservations about signing any agreements which specified necessary conditions of employment. As her Certification in lieu of Affidavit discloses, Peacock decided to arbitrate her dispute with Great Western because "I could not afford the fee that my first law firm, Hannoch Weisman, would have charged me to challenge the arbitration agreement."[26] Hence, Peacock agreed to arbitration not because of coercion on the part of Great Western, as she claims, but because of the fees that she would have been charged had she resorted to other legal proceedings. Moreover, during this period of time she was represented by counsel.

Peacock adduced no evidence and made no argument that the terms of the Arbitration Agreement were kept from her. Although her brief on appeal argues that Peacock had remained generally ignorant of the details of the Arbitration Agreement-- and suggests that Great Western deliberately kept her in the dark until her "job hung in the balance"[27]--it is clear that she made

26. Supplemental Certification of Michele Peacock, App. at 187a.

27. Appellant's Brief at 23.

13

no effort to find out the terms of the Arbitration Agreement to which she had agreed as a condition of her employment. Indeed, Peacock's attorney agreed that Peacock would have signed anything in order to be hired.[28]

At oral argument before the district court her attorney also conceded that she could have asked to see a copy of the Arbitration Agreement before she started working, and there was, and is, no issue presented that she had not read the employment papers which she had signed.[29]

## C.

The true thrust of Peacock's argument is that signing the Certification and the Arbitration Agreement was a condition of Great Western's employment, which she accepted only because she was the weaker of the two parties to the employment contract.[30] Yet, as the Supreme Court has made clear in Gilmer

---

28. App. at 166a.

29. App. at 165a. Further, the Certification in the employment application begins by instructing applicants to read the Certification carefully before signing, and to ask for assistance with any questions respecting its terms. The Certification goes on to state clearly that by agreeing to binding arbitration an applicant was "waiving any right to pursue any other administrative and/or legal proceeding." Id. at 22a.

30. We note that the only condition of employment challenged by Peacock is the binding arbitration requirement. She nowhere claims that the other conditions of employment--which required Peacock, among other things, to be fingerprinted, to pass a physical examination, to take a drug test, to agree to credit checks, to be bonded, and to allow Great Western to contact her references in the course of a background investigation--were either coerced or unenforceable.

v. Interstate/Johnson Lane Corp.,[31] more than a disparity in bargaining power is needed in order to show that an arbitration agreement was not entered into willingly.  See also Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1118 (3d Cir. 1993) (rejecting argument that arbitration clause was adhesive merely because there was a disparity in bargaining power).

In Gilmer, Gilmer had been required by his employer to register as a securities representative with the New York Stock Exchange (NYSE).  His registration application required Gilmer to arbitrate controversies with respect to employment or termination of employment.  When Gilmer's employment was terminated at age 62 he brought suit in district court, claiming a violation of the Age Discrimination in Employment Act of 1967.  In response, his employer moved to compel arbitration, relying upon Gilmer's registration application and the FAA.  Although the district court denied Gilmer's motion, the court of appeals reversed that ruling, and the Supreme Court, in turn, affirmed the court of appeals.  The Court held that statutory claims such as Gilmer's may be the subject of an arbitration agreement and enforceable under the FAA, and that "[m]ere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context."[32]

31.  500 U.S. 20, 33 (1991).
32. 500 U.S. at 33.

15

The Court noted that Gilmer, who was an experienced businessman, had not been coerced or defrauded into agreeing to arbitrate. Similarly, the record in this case reveals no indication that Peacock, who was a Business Administration graduate with four and one-half years of college education, was coerced or defrauded when she agreed to arbitrate any controversy that might arise out of her employment with Great Western.[33] She does not allege that Great Western misled her or concealed anything from her, and as we have recounted earlier, Peacock had effectively agreed to arbitration on three separate occasions. See IIB, supra.

The district court did not err in ruling that Peacock had willingly agreed to arbitrate under Great Western's Arbitration Agreement.


**III.**

Nor is there merit to Peacock's claims that New Jersey's public policy, as expressed in NJLAD,[34] is offended by requiring her to arbitrate her sexual harassment claim. Peacock

---

33. The kind of "fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract,'" as the Supreme Court stated the matter in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc., 473 U.S. 614, 627 (1985)(quoting 9 U.S.C. § 2), is not present in the instant case. See also Coleman v. Prudential Bache Securities, Inc., 802 F.2d 1350, 1352 (11th Cir. 1986)("absent a showing of fraud or mental incompetence," a party to an arbitration agreement will be held bound to its terms).

34. New Jersey's LAD provides that practices of discrimination entailing race, creed, color, national origin, ancestry, age, sex, or affectional or sexual orientation, among others, are proscribed and actionable. N.J.S.A. 10:5-1 et seq.

16

argues that New Jersey public policy is expressed clearly in NJLAD, and that because attorney's fees, a two-year statute of limitations, discovery, and punitive damages are all available under NJLAD, any agreement like the Arbitration Agreement which prospectively deprives an employee of these rights runs counter to that public policy. She also contends that, apart from NJLAD, New Jersey's standards for establishing waiver of a jury trial are not met by the Arbitration Agreement. Peacock, accordingly, concludes that her agreement to arbitrate is unenforceable. We disagree with Peacock that the waiver embodied in the Arbitration Agreement of certain rights afforded by New Jersey law renders the Agreement unenforceable under the FAA.

First, it is evident that the FAA is meant to have a preemptive effect, albeit a narrow one. In enacting the FAA, Congress declared "a national policy favoring arbitration" and "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."[35] Thus, a court considering a motion made under Section 4 of the FAA, see n.25, supra, may be called upon to decide whether the FAA preempts some state law unfavorable to arbitration.

It is also clear that the FAA will preempt such laws. The Supreme Court, in Mastrobuono v. Shearson Lehman Hutton, Inc., 115 S.Ct. 1212 (1995), Perry v. Thomas, 482 U.S. 483 (1987), and Southland Corp. v. Keating, 465 U.S. 1 (1984), has

---

35.Southland Corp. v. Keating, 465 U.S. 1, 10 (1984).

17

held that arbitration agreements within the scope of the FAA may be enforced even if they conflict with state law policies that would preclude arbitration.

However, while Congress's intention in enacting the FAA was to provide federal court enforcement of a waiver of the right to a judicial forum respecting a state statutory claim, the preemptive effect of the FAA is restricted to the question of arbitrability, and as previously discussed, whether the agreement to arbitrate is valid. See IIA, supra. The "FAA preempts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)(quoting Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)). Thus, a court compelling arbitration should decide only such issues as are essential to defining the nature of the forum in which a dispute will be decided.

The FAA does not otherwise preempt state law. "The FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." Volt, 489 U.S. at 477. Once a dispute is determined to be validly arbitrable, all other issues are to be decided at arbitration. Since the purpose of the FAA is to ensure that agreements to arbitrate are enforced, a court compelling arbitration should preserve the remaining disputed issues for the arbitrator to decide. Any argument that the provisions of the Arbitration Agreement involve a waiver of substantive rights

18

afforded by the state statute may be presented in the arbitral forum. It would be anomalous for a court to decide that a claim should be referred to an arbitrator rather than a court, and then, by deciding issues unrelated to the question of forum, foreclose the arbitrator from deciding them.

Second, we note that in the absence of a state law which discourages the enforcement of arbitration agreements, no question of preemption, as such, is presented. The issue in such cases is whether a waiver of state law rights is enforceable under the FAA, rather than whether state law rights are themselves preempted by the FAA. The instant controversy presents such a case.

Peacock has failed to demonstrate any New Jersey policy against arbitration of claims such as hers. Accordingly, we reject her argument that the Arbitration Agreement is void as a matter of public policy. Clearly, as we just described, the waiver of a state law right to a judicial forum for the resolution of state claims is enforceable under the FAA. Thus, Peacock, by agreeing to arbitration on three occasions, effectively waived her right to a jury trial.[36] Likewise, the

---

36. In addition to insisting that she was entitled to a jury trial as a matter of New Jersey's public policy, Peacock also claims that she was entitled to a jury trial to determine whether the parties agreed to arbitrate. Her request is grounded on Section 4 of the FAA, which provides: "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. She claims that the district court ignored her request for a jury trial.

The record clearly reveals, however, that there could be no material dispute of fact as to Peacock's having agreed to arbitrate. The arguments raised by Peacock, contending that she did not so agree, were properly discounted by the district court,

19

waiver of the state-created right that Peacock claims to litigation-type discovery is also enforceable under the FAA.[37]

As to the waiver of state law rights unrelated to the provision of a judicial forum, we hold only that the inclusion of such waivers in a document described as an "Arbitration Agreement" cannot be asserted to avoid the arbitration agreed to therein.  Rather, the party challenging the validity of such waivers must present her challenge to the arbitrator, who will determine the validity and enforceability of the waiver of asserted state law rights.  Thus, here we leave it to the

(..continued)
and are rejected by us.  Because no material dispute of fact as to her agreement was discerned by the district court--nor is any discerned by us--the district court properly denied her request for a jury trial.
        In Doctor's Associates, Inc. v. Jabush, 89 F.3d 109, 114 (2d Cir. 1996), a party resisting a motion to compel arbitration sought a jury trial.  The court ruled that a party does not become entitled to a jury trial under the FAA merely by demanding one, but bears the burden of demonstrating that there is a genuine issue as to whether there was an agreement to arbitrate.  The Second Circuit held that to "establish a genuine issue entitling a party to a jury trial, 'an unequivocal denial that the agreement [to arbitrate] had been made [is] needed, and some evidence should [be] produced to substantiate the denial.'" (citing and quoting Interbras Cayman Co. v. Orient Victory Shipping Co., S.A., 663 F.2d 4, 7 (2d Cir. 1981).  See also Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 983-84 (2d Cir. 1996)(party resisting arbitration does not get a jury trial merely by demanding one)(citations omitted); Dillard v. Merrill Lynch, Pierce, Fenner & Smith Inc., 961 F.2d 1148, 1154 (5th Cir. 1992)(party resisting arbitration bears "the burden of showing that he is entitled to a jury trial under § 4 of the Arbitration Act," and must produce at least some evidence in support of factual allegations)(quoting Bhatia v. Johnston, 818 F.2d 418, 422 (5th Cir. 1987)), cert. denied, 506 U.S. 1079 (1993).

37.  Indeed, given that Great Western argues that informal discovery will be available at arbitration, there appears to be no point at issue here.  Appellee's Brief at 42; App. at 66a-67a.  See Gilmer, 500 U.S. at 31 (less extensive, more informal discovery available in arbitral forum does not render arbitral forum inadequate to vindicate statutory rights).

arbitrator to determine whether Peacock has waived her right to attorney's fees[38] or to a two-year statute of limitations.[39]

We also do not rule on whether Peacock has waived her right to punitive damages under NJLAD--a waiveable state right not preempted by the FAA. The availability of punitive damages is not relevant to the nature of the forum in which the complaint will be heard. Thus, availability of punitive damages cannot enter into a decision to compel arbitration. NJLAD provides that a victim of unlawful discrimination may be awarded punitive damages, but the issue of whether this right has been waived, see Swarts v. Sherwin-Williams Co., 581 A.2d 1328, 1331 (N.J. Super. Ct. App. Div. 1990), is separate and apart from the issue of whether an employee has agreed to an arbitral forum, and hence, is for the arbitrator to decide. See Mastrobuono, 115 S.Ct. 1212 (1995).

---

38. Peacock asserts that NJLAD's provision for attorney's fees makes the Arbitration Agreement inconsistent with New Jersey public policy. Great Western has acknowledged in this proceeding, however, that the Arbitration Agreement authorizes the arbitrator to award counsel fees.

39. Peacock actually filed her claim within the one-year period provided for in the Arbitration Agreement.

21

Finally, we are obliged to address one last argument made by Peacock. Peacock argues that, for two reasons, Great Western had waived its right to arbitrate. First she asserts that Great Western breached the Arbitration Agreement by failing to submit her claim to JAMS within ten days after receiving it from her.[40] In light of the fact that we are affirming the Order of the district court compelling arbitration, the issue of whether Great Western used its best efforts to commence arbitration in a timely fashion is for the arbitrator to determine.[41]

Her second claim is that Great Western, by failing to seek another arbitrator after JAMS refused to arbitrate the dispute,[42] waived its right to seek arbitration.

40. Great Western's Arbitration Policy provides that Great Western, within ten business days of receiving a demand for arbitration, should "use its best efforts to commence arbitration proceedings by submitting the dispute to the Judicial Arbitration & Mediation Services ("J.A.M.S.") or, if applicable, a comparable arbitration service." App. at 66a.

41. Peacock's initial request for arbitration was made in a letter dated August 23, 1995. On September 7, 1995--ten business days later--Great Western indicated to Peacock's prior counsel that the matter had been forwarded to Great Western's Legal Department for processing.

42. According to Peacock, Great Western's arbitration policy failed to meet JAMS's standards of procedural fairness, and JAMS refused to accept her case for arbitration. Peacock points to the following statement of JAMS standards, in particular:
"These minimum standards for employer-wide arbitration procedures are:
1. The rights and remedies that would otherwise be available to an individual under applicable federal, state or local law should remain available under the arbitration clause, unless the individual employee would retain the right to pursue the unavailable remedies in court. We are particularly concerned that the clause maintains the right to try to win exemplary

This argument, which is tantamount to claiming that Great Western waived its right to compel arbitration, is without merit. Peacock adduces no evidence that would allow us to find that Great Western had waived its right to compel arbitration. Courts deciding whether a party has waived a right to compel arbitration must make an initial determination as to whether the conditions of waiver have been met, and waiver under the FAA is not to be lightly inferred.[43]

Even if we were to accept Peacock's argument that Great Western failed to request a second arbitrator after JAMS refused to accept arbitration, Peacock did not establish waiver. Peacock provides no record evidence either of the date on which JAMS refused to arbitrate, or of the date on which Great Western was informed of JAMS's refusal to arbitrate her claim.

Moreover, the record reveals that JAMS's refusal to arbitrate came long after Peacock herself withdrew the matter from arbitration,[44] and that Great Western did attempt to secure another arbitrator.[45] Thus, while Peacock fails to indicate

(..continued)
damages (e.g., punitive damages, which the Civil Rights Act of 1991 allow [sic] as available damages in certain circumstances; and, double damages for 'willful' conduct under the federal age discrimination statutes), but only if such damages are available under the relevant law." Appellant's Brief at 33-34.

43. PaineWebber Inc. v. Faragalli, 61 F.3d 1063, 1068 (3d Cir. 1995)(citations omitted).

44. Certification of Neil Mullin, App. at 90a.

45. Great Western's counsel, just two days after the district court Order compelling arbitration of Peacock's claim, informed Peacock's counsel that in light of JAMS's refusal to arbitrate, and pursuant to Paragraph 3 of the Arbitration Agreement, the parties were required to select a new arbitrator.
Letter, April 11, 1996, Record Ex. B.

either precisely when JAMS refused to arbitrate, or when that knowledge was made known to Great Western, it was not until February 1996 that Peacock's second attorney certified that JAMS had made him aware of its policies just several weeks earlier.[46] Peacock, of course, had by that time, long since withdrawn her claim from arbitration by her counsel's letter of October 25, 1995.

In other words, the arbitration process stalled neither because JAMS refused to arbitrate, nor because Great Western waived arbitration, but because Peacock refused to continue the arbitration process. Thus, no inference can be drawn that Great Western had waived its right to compel arbitration.

Next, the record makes clear that Great Western's response was always to insist that the only forum in which Peacock's complaints could be heard was the arbitral forum. In fact, in response to the letter of May 18, 1995, in which Peacock's allegations of sexual harassment were first made known to Great Western, Great Western advised Peacock that she could bring her claim to an arbitrator.[47] Once Peacock filed her claim and then withdrew from arbitration, Great Western was consistent in preserving its right to an arbitral forum. Thus Great

46.   The Certification of Peacock's attorney, Neil Mullin, dated February 26, 1996, states: "Several weeks ago, I was advised by a Mr. Elston of JAMS/Endispute that the Great Western 'arbitration policy' and the alleged 'arbitration agreement' between Michele Peacock and Great Western failed to meet JAMS/Endispute's minimum standards.  Mr. Elston advised me that consequently, JAMS/Endispute would not entertain arbitration in this matter." App. at 90a.

47. App. at 44a.

24

Western, as its brief on appeal demonstrates, informed JAMS of its intention to preserve its right to arbitration:

. . . Peacock initiated the arbitration on August 25, 1995 . . . . On October 25, 1995, her new counsel purported to rescind all three arbitration agreements . . . . On November 8, 1995, Peacock filed suit against Great Western in New Jersey Superior Court and resisted all efforts to compel arbitration . . . .
Upon learning it had been sued, Great Western sent a letter to JAMS/Endispute, dated December 6, 1995, advising it that Peacock was now refusing to arbitrate. Great Western stated in its letter that:

The defendants will respond to this lawsuit and assert the

enforceability of the Arbitration Agreement.

However, until such time as the enforceability of

the Arbitration Agreement is resolved,

JAMS/ENDISPUTE need not take any action on this

file.[48]

Indeed, Great Western attempted to preserve its right to an arbitral forum by seeking to compel arbitration in state court[49] as well as in federal court. Moreover, after becoming aware of JAMS's refusal to arbitrate Peacock's claim, Great Western notified Peacock's counsel of the need to refer the dispute to another arbitration service.[50]

Given the burden that Peacock bears in demonstrating waiver, and her lack of evidence in support of her assertions, we are satisfied that Great Western clearly preserved the right to

---

48. Appellee's Brief at 43-44 (citations omitted); Supplemental Appendix, annexed thereto, at 7.

49. App. at 100a.

50. See n.45 supra.

refer Peacock's claim to arbitration. As we have stated, waiver is not to be lightly inferred.[51] Indeed, a party waives the right to compel arbitration only in the following circumstances: when the parties have engaged in a lengthy course of litigation, when extensive discovery has occurred, and when prejudice to the party resisting arbitration can be shown.[52]

In this case, none of these factors have been shown. Great Western did not initiate any litigation, and in response to Peacock's suit in state court, Great Western responded vigorously by moving for a stay of proceedings and for an order compelling arbitration in both state and federal courts. There has been no discovery initiated by Great Western, no litigation on the merits, and no prejudice which has inured to Peacock. In short, the record discloses that Great Western has not waived its right to compel arbitration of Peacock's claims.

---

51. PaineWebber Inc. v. Faragalli, 61 F.3d 1063, 1068 (3d Cir. 1995)(citations omitted).

52. Id. at 1068-69; Gavlik Const. Co. v. H.F. Campbell Co., 526 F.2d 777, 783-84 (3d Cir. 1975)(rejecting argument that party compelling arbitration waived right by filing third-party complaint, because prejudice was not shown); Hoxworth v. Blinder, Robinson & Co. Inc., 980 F.2d 912, 925-27 (3d Cir. 1992)(party waived right to compel arbitration because by contesting the merits in litigation, party opposing arbitration had been prejudiced).

**V.**

The district court's Order of April 9, 1996, which, among other provisions, compels arbitration, will be affirmed.