Philip THIBODEAU, Appellee

v.

COMCAST CORPORATION, Comcast Cable Communications, Inc., Comcast Holdings Corporation, Comcast Cable Communications Holdings, Inc., Comcast Cable Holdings, LLC, Comcast MOP Group, Inc., Comcast MO of Delaware, Inc., Comcast of Massachusetts II, Inc., and AT & T Corporation, Appellants.

Superior Court of Pennsylvania.

Argued July 25, 2006.

Filed Dec. 1, 2006.

Stephen V. Saia, Pembroke, MA, for AARP, Amicus Curiae.

Robert C. Heim, Philadelphia, for Comcast, appellant.

Mark Cuker, Philadelphia, for appellee.

BEFORE: MUSMANNO, KLEIN and TAMILIA, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 In this consolidated appeal, Comcast Corporation, Comcast Cable Communications, Inc., Comcast Holdings Corporation, Comcast Cable Communications Holdings, Inc., Comcast Cable Holdings, LLC, Comcast MOP Group, Inc., Comcast MO of Delaware, Inc., Comcast of Massachusetts II, Inc., and AT & T Corporation (collectively, "Comcast"), appeal from the two trial court Orders entered on June 10, 2005, in which the trial court denied Comcast's Petition to compel arbitration and stay litigation, as well as Comcast's Preliminary Objections. We affirm.

¶ 2 In this appeal, Comcast argues that the trial court erred in its interpretation of the doctrine of federal preemption in determining that the Federal Arbitration Act ("FAA")[1] did not preempt Pennsylvania state law. Specifically, Comcast challenges the trial court's conclusion that the arbitration clause, contained in Philip Thibodeau's ("Thibodeau") Consumer Agreement (the "Agreement") with Comcast, was unconscionable and, thus, unenforceable. This appeal presents this Court with a matter of first impression in Pennsylvania.

¶ 3 The relevant facts of this case are set forth as follows. Thibodeau lives in Massachusetts, where he subscribed to Comcast's cable television service. Comcast's corporate headquarters is located in Philadelphia, Pennsylvania. Pursuant to his cable subscription, Thibodeau received non-premium television channels, otherwise known as extended basic service. As part of his cable services, Thibodeau was required to pay monthly charges for cable converter boxes and remote controls. However, Thibodeau subsequently learned that the use of the cable converter boxes and remote controls were not necessary to receive basic service.

¶ 4 Thibodeau has been a cable television subscriber since 1998. Thibodeau originally received cable television services though AT & T Broadband. However, in 2002, Comcast acquired AT & T Broadband. The trial court explained the events following the acquisition as follows:

After the acquisition, AT & T customers were mailed a new Comcast customer [A]greement which contained new terms unilaterally imposed by Comcast. The new customer [A]greement mandated individual arbitration and precluded class actions by aggrieved customers. The old AT & T and new Comcast [A]greements were virtually identical in terms of style, font size, type and layout. The only aesthetic difference between [the two agreements] was a small icon on the first page. The image was originally the AT & T logo, which was replaced by the Comcast logo.

There were, however, significant substantive differences. On the 8th page of the 10–page document, the Comcast [A]greement reads:

10. MANDATORY AND BINDING ARBITRATION

IF WE ARE UNABLE TO RESOLVE INFORMALLY ANY CLAIM OR DISPUTE RELATED TO OR ARISING OUT OF THIS

1. 9 U.S.C. § 1–16.

AGREEMENT OR THE SERVICES PROVIDED, WE HAVE AGREED TO BINDING ARBITRATION EXCEPT AS PROVIDED BELOW. YOU MUST CONTACT U.S. WITHIN ONE (1) YEAR OF THE DATE OF THE OCCURRENCE OF THE EVENT OR FACTS GIVING RISE TO A DISPUTE (EXCEPT FOR BILLING DISPUTES WHICH ARE SUBJECT TO PARAGRAPH J, RATES AND CHARGES, ABOVE), OR YOU WAIVE THE RIGHT TO PURSUE A CLAIM BASED UPON SUCH EVENTS, FACTS OR DISPUTE.

THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED UNLESS YOUR STATE'S LAWS PROVIDE OTHERWISE.

Trial Court Opinion, 1/24/06, at 5 (footnote omitted).

¶ 5 On March 19, 2004, Thibodeau filed a class action Complaint in the Court of Common Pleas of Philadelphia County against Comcast on behalf of a putative class of Comcast customers. Thibodeau averred that these customers were improperly billed for cable converter boxes and remote controls, which were unnecessary for basic service plans. On April 23, 2004, Comcast filed a Notice of removal to the federal district court. However, the case was remanded back to the Court of Common Pleas of Philadelphia County on October 25, 2004. Comcast then filed a Petition to compel arbitration and stay litigation on December 17, 2004. Thereafter, on December 23, 2004, Comcast filed Preliminary Objections to Thibodeau's class action and representative claims.

¶ 6 The trial court held oral argument on both of Comcast's filings on January 24, 2005. The trial court then entered two Orders on June 10, 2005, denying Comcast's Petition to compel arbitration and its Preliminary Objections. On July 6, 2005, Comcast filed a Notice of appeal at 2176 EDA 2005 from the trial court's Order denying Comcast's Petition to compel arbitration and stay litigation. On the same date, Comcast filed a second Notice of appeal at 2177 EDA 2005 from the trial court's Order overruling its Preliminary Objections.[2] We consolidated these appeals for the purpose of our review.

¶ 7 On appeal, Comcast raises the following issues:

1. Whether the trial court committed errors of law when it denied Comcast's Petition to compel Arbitration and Preliminary Objections?

---

**2.** We note that ordinarily an appeal from an order denying preliminary objections is considered to be interlocutory. *F.D.P. v. Ferrara,* 804 A.2d 1221, 1226 (Pa.Super.2002). However, in this case, Comcast moved to compel arbitration in its Preliminary Objections. *See* Pa.R.C.P. 1028(a)(6) (permitting objection based upon "an agreement for alternative dispute resolution"); Pa.R.C.P. 1028 note (explaining that "agreement to arbitrate may be asserted by preliminary objection or by petition to compel arbitration"). Accordingly, the trial court's Order denying Comcast's Preliminary Objections is immediately appealable. *See* 42 Pa.C.S.A. § 7320(a)(1); *Goldstein v. Depository Trust Co.,* 717 A.2d 1063, 1064 (Pa.Super.1998) (holding that an order denying a petition to compel arbitration is immediately appealable).

2. Whether the trial court properly applied Pennsylvania law, rather than Massachusetts law?

3. Whether the trial court erred in concluding that the consumer arbitration agreement was an unconscionable contract of adhesion?

See Brief for Appellant at 2.

■ ¶ 8 In its first claim of error, Comcast asserts that the trial court erred in denying its Petition to compel Arbitration and Preliminary Objections. At the heart of Comcast's argument lies its contention that the trial court erroneously interpreted and applied the FAA when it concluded that the FAA does not preempt the application of state law. Comcast argues that the FAA broadly preempts state law from invalidating arbitration agreements. Comcast characterizes the trial court's Opinion as a blanket invalidation of arbitration agreements in consumer contracts on the basis of Pennsylvania public policy. Thibodeau counters Comcast's argument, contending that the FAA permits application of general state contracts law. In asserting that the arbitration clause, which required individual arbitration and prohibited class-wide arbitration, was invalid, Thibodeau argues that pursuant to Pennsylvania state law, the clause was an unconscionable contract of adhesion.

■ ¶ 9 The FAA is applicable to arbitration agreements that are (1) in writing and (2) part of a "contract evidencing a transaction involving interstate commerce." 9 U.S.C. § 2. The parties here concede that the Agreement is governed by the FAA. Challenges to the validity of arbitration agreements governed by the FAA can be classified as one of two types: (1) a challenge specifically to the arbitration clause; or (2) a challenge to the contract as a whole. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, ——, 126 S.Ct. 1204, 1208, 163 L.Ed.2d 1038 (2006).

This case involves a challenge specifically to the arbitration clause. Consequently, this issue was properly decided by the trial court. *See id.* at 1209 (holding that "unless a challenge is to the arbitration clause itself, the issue of a contract's validity is considered by the arbitrator in the first instance").

■ ¶ 10 The standard of review of a state court's determination of whether an enforceable arbitration agreement exists directs a state court to

look to the body of federal arbitration law," *Bhatia [v. Johnston]*, 818 F.2d [418] at 421 [5th Cir.1987], which recognizes that "the question of arbitrability [is to] be addressed with a 'healthy regard for the federal policy favoring arbitration,' with doubts regarding the scope of the agreement resolved in favor of arbitration." *Id.* (quoting *Moses H. Cone [Memorial Hosp. v. Mercury Const. Corp.]*, 460 U.S. [1] at 24–25, 103 S.Ct. [927] at 941 [, 74 L.Ed.2d 765 (1983) ]). As to the more specific issue of whether there is a valid agreement to arbitrate, " 'courts generally ... should apply ordinary state-law principles that govern the formation of contracts,' " *Webb [v. Investacorp, Inc.]*, 89 F.3d [252] at 257 [5th Cir.1996] (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995)), but in doing so, must give "due regard ... to the federal policy favoring arbitration," *id.* (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1253–54, 103 L.Ed.2d 488 (1989)); *McKee v. Home Buyers Warranty Corp. II*, 45 F.3d 981, 984 (5th Cir.1995) ("In construing an arbitration agreement within the scope of the FAA, 'as with any other contract, the parties' intentions control, but those intentions are

generously construed as to issues of arbitrability.'") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 627, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). At the same time, however, the court may grant relief to a party opposing arbitration where he presents "well supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract,'" *Mitsubishi Motors,* 473 U.S. at 627, 105 S.Ct. 3346, 87 L.Ed.2d 444 (quoting 9 U.S.C. § 2); *see also Bhatia,* 818 F.2d at 421 (court should at all times "remain keenly attuned to well-grounded claims that 'the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract."'" (quoting 9 U.S.C. § 2)); *Rhode v. E & T Investments, Inc.,* 6 F.Supp.2d 1322, 1326 (M.D.Ala.1998) ("[Section] 2 'gives States ... methods for protecting consumers against unfair pressure to agree to a contract with an unwarranted arbitration provision' both in equity and under principles of contract law." (quoting *Allied–Bruce Terminix v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995))).

*Lytle v. CitiFinancial Services, Inc.,* 810 A.2d 643, 656–57 (Pa.Super.2002) (citing *Bank One, N.A. v. Coates,* 125 F.Supp.2d 819, 828–29 (S.D.Miss.2001), aff'd, 34 Fed. Appx. 964 (5th Cir. Miss.), 2002 WL 663804, 2002 U.S.App.LEXIS 7759 (2002)). With this standard of review in mind, we undertake our analysis of the issues raised in this appeal.

¶ 11 The United States Supreme Court has outlined the purposes and objectives of the FAA as follows:

The FAA was designed "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219–220, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), and to place such agreements " 'upon the same footing as other contracts,'" *Scherk v. Alberto–Culver Co.,* 417 U.S., 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). While Congress was no doubt aware that the Act would encourage the expeditious resolution of disputes, its passage "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered." *Byrd,* 470 U.S. at 220, 105 S.Ct. 1238.... [The FAA] simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (the Act was designed "to make arbitration agreements as enforceable as other contracts, but not more so").

*Volt Information Sciences, Inc.,* 489 U.S. at 478, 109 S.Ct. 1248.

¶ 12 In order to resolve the first issue raised on appeal, we must determine whether Congress, through the enactment of the FAA, sought to occupy the entire field of arbitration agreements, thus preempting the application of state law as it relates to arbitration agreements. Upon review of the FAA, it is clear that Congress did not intend to occupy the entire field of arbitration agreements. The FAA does not contain any explicit preemptive provisions. Moreover, section 2 of the FAA specifically provides for the application of state law in certain circumstances consistent with the FAA's purpose. Section 2 of the FAA specifically provides as follows:

A written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

¶ 13 In interpreting section 2 of the FAA, the United States Supreme Court has held that the FAA does not preempt the application of all state law. The United States Supreme Court interpreted Section 2 of the FAA as mandating the enforcement of arbitration agreements that "evidence a transaction involving commerce, unless [the arbitration clause is] revocable on other grounds." *Southland Corp. v. Keating*, 465 U.S. 1, 11–12, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (footnote omitted).

■ ¶ 14 Accordingly, a party may avoid being compelled to arbitrate a claim pursuant to the FAA if they produce evidence that grounds exist in state law concerning the validity, revocability, and enforceability of contracts in general. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [section] 2." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (quotations and citations omitted). While state law may be preempted where the law applies solely to arbitration agreements, placing the arbitration agreement on unequal footing from the rest of the contract, the FAA does not preempt the application of state law that applies equally to all contracts. *Allied–Bruce Terminix Companies, Inc.*, 513 U.S. at 281, 115 S.Ct. 834. The effect of section 2 is that state contract law doctrines become part of the federal law of arbitrability.

¶ 15 In this case, the trial court applied general principles of Pennsylvania contract law, applicable to all contracts, when it concluded that the arbitration provision at issue was unconscionable and unenforceable. The arbitration provision in Comcast's customer Agreement provided for mandatory and binding individual arbitration and specifically excluded arbitration on a class-wide or representative basis.

■ ¶ 16 Pennsylvania law concerning the enforceability of arbitration agreements is in accordance with Federal law, requiring that arbitration agreements be enforced as written and allowing an arbitration provision to be set aside only for generally recognized contracted defenses such as duress, illegality, fraud and unconscionability. *Lytle*, 810 A.2d at 656. As the trial court explained in its well-written Opinion, Pennsylvania law, like the FAA, favors arbitration. However, where the arbitration clause is contained in an adhesion contract and unfairly favors the drafting party, such clauses are unconscionable and must be deemed unenforceable.

¶ 17 The trial court in the instant case explained:

Business regularly uses binding arbitration as a mechanism for alternate dispute resolution.[FN3] The prevalence of arbitration is evidenced by the ever-increasing number of private arbitrations conducted annually, in the many excellent firms doing arbitration and other forms of [alternative dispute resolution ("ADR")], and in the proliferation of mandatory binding arbitration clauses in consumer and business contracts. In

virtually every jurisdiction in the United States, the judiciary encourages arbitration as an alternative to the potential delay, costs and unpredictability of litigation.

FN3 Murray S. Levin, The Role of Substantive Law in Business Arbitration and Importance of Volition, 35 Am. Bus. L.J. 105, 105 (Fall 1997).

Arbitration usually provides a quicker, less expensive, and always a more private alternative to traditional litigation. Arbitration typically involves simplified procedures, a less formal setting, and often more technically experienced and knowledgeable decision-makers. Although arbitration is similar to traditional litigation in that it requires the presentation of proofs, arguments and neutral decision-making, parties can often tailor arbitration processes to the dispute involved. The less formal nature of arbitration proceedings can minimize hostility between parties, thus facilitating ongoing and future business relationships. Arbitration is justifiably favored by the law.

The organized bar officially recognized Alternative Dispute Resolution thirty years ago, when in 1976 the American Bar Association established a Special Committee on Minor Disputes, now called the ABA Section of Dispute Resolution.[FN4] Virtually all state and federal bar associations now have ADR committees. The United States Supreme Court views arbitration as a viable alternative to traditional litigation. In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the United States Supreme Court held that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Pennsylvania law also encourages arbitration. As early as 1968, the Pennsyl-vania Supreme Court stated that "[Pennsylvania] statutes encourage arbitration and with our dockets crowded and in some jurisdictions con[g]ested[,] arbitration is favored by the courts."[FN5] Arbitration is considered a "necessary tool for relieving crowded dockets and ensuring the swift and orderly settlement of disputes."[FN6]

FN4 The ABA Section of Dispute Resolution can be found on the internet at http://www.abanet.org/dispute/home.html.

FN5 *Mendelson v. Shrager*, 432 Pa. 383, 248 A.2d 234, 235 (Pa.1968).

FN6 *Langston v. Nat'l Media Corp.*, 420 Pa.Super. 611, 617 A.2d 354 (Pa.Super.1992).

Pennsylvania law also regulates class action consumer litigation and encourages class action arbitration. In *Dickler v. Shearson Lehman Hutton*, 408 Pa.Super. 286, 596 A.2d 860, 866 (Pa.Super.1991), the Superior Court affirmed Pennsylvania's longstanding policy favoring class wide arbitration. Defendant Shearson Lehman's customer agreement was silent as to whether plaintiffs could pursue a class arbitration. Holding that explicit language permitting class action arbitrations was unnecessary, the Superior Court enforced the agreement's "any controversy" language:

[ ]Given the three paths down which this litigation can be directed—compelled individual arbitration, class action in a court of law, or compelled class wide arbitration—the last choice best serves the dual interest of respecting and advancing contractually agreed upon arbitration agreements while allowing individuals who believe they have been wronged to have an economically feasible route to get injunctive relief from large institutions employing adhesion contracts.[ ]

The Superior Court reasoned that if the agreement *sub silentio* compelled individual arbitration and precluded class actions, the effect was against public policy because it would force consumers:

[ ] ... already straightjacketed by an industry-wide practice of arbitration agreements to fight alleged improprieties at an exorbitant cost. Individual arbitration would be a small deterrent to companies certain that few proceedings will be instituted against them. Because the principles of *res judicata* and collateral estoppel are not applicable to arbitration proceedings, each plaintiff would be forced to fully litigate his complaint.[ ]

The Superior Court held that in Pennsylvania, consumer class action litigation is of such public importance that public policy considerations allow class action arbitration even if an arbitration agreement does not explicitly so provide.[FN7] Nonetheless, control of class action litigation is also of such public importance that the proper referral to class arbitration occurs only after a Court determines whether certification is proper.

[FN7] Federal court decisions have held *contra,* precluding class action arbitration unless specifically provided in the agreement. *See Champ v. Siegel Trading Co., Inc.,* 55 F.3d 269 (7th Cir.1995); *Gray v. Conseco, Inc.,* 2001 WL 1081347, 2001 U.S. Dist. LEXIS 21696 (D.Cal.2001); *Bischoff v. DirecTV,* 180 F.Supp.2d at 1108.

In the case[ ] presently before this Court, the [A]greement[ ] explicitly preclude[s] class action arbitration, and the issue presented is whether such preclusion is permissible under Pennsylvania law.

. . .

Accordingly, this Court has analyzed the Comcast [ ][A]greement[ ] in light of common law contract defenses including unconscionability.

Contracts of adhesion are standardized form contracts presented to consumers without negotiation or any option for modification. *In Robinson [Robson] v. E.M.C. Insurance,* 785 A.2d 507, 510 (Pa.Super.2001), the Superior Court defined a contract of adhesion as one "prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms." The Comcast [ ] customer [A]greement[ ] received by the plaintiff[ ] and all other class members are clearly contracts of adhesion. They were sent without any opportunity for customers to negotiate and even without any requirement of assent to the mandated individual arbitration and preclusion of class action litigation.

There is nothing *per se* wrong with a contract of adhesion. Not every contract of adhesion contains unconscionable provisions. A contract of adhesion is only unconscionable if it unreasonably favors the drafter. In *Jim Dan, Inc. v. O.M. Scott & Sons Co.,* 735 [785] F.Supp. 1196, 1200 [ (S.D.N.Y.1990 [W.D.Pa.1992]) ], the United States District Court for the Eastern District of Pennsylvania interpreted Pennsylvania State law, holding:

[ ]In determining whether a clause is unconscionable, the court should consider whether, in light of the general commercial background and the commercial needs of a particular trade, the clause is so one-sided that it is unconscionable under the circumstances.[ ]

In *Zak v. Prudential Property and [Casualty] Insurance Co.,* 713 A.2d 681 (Pa.Super.1998), the Superior Court found that provisions of an insurance policy, while facially equal, were factual-

ly "completely unconscionable." The policy required that any arbitration award under $15,000 was binding on the parties, but either party was entitled to a trial *de novo* if an award was greater than $15,000. Although the provision was facially equal because either party could appeal a large award, the clause was unconscionable because the effect of the clause was clearly unequal:

[The policy] allows the insurance company the unfettered right to a trial whenever an award is made in favor of a claimant or insured while a losing claimant or insured is bound by the award. The clause so clearly favors the insurer over the claimant or insured that it is repugnant to notions of due process, equal protection, justice, and fair play.[ ]

The Superior Court found the clause void [as] unconscionable. The *Zak* decision instructs that even language which appears to be facially neutral can nonetheless be unconscionable if its effect is one-sided.

In *Lytle v. Citi[F]inancial Services,*[FN8] plaintiffs were required to pay unearned finance charges and prepayment penalties when they refinanced their mortgage. The refinancing agreement had a mandatory arbitration clause requiring all controversies over $15,000 to be arbitrated individually, and precluded class litigation or arbitration. On appeal, plaintiffs, who had lost below, argued that the arbitration agreement was unconscionable, against public policy, and unenforceable because it effectively, factually reserved the right of access to the courts to the mortgagee alone. While remanding the case to the lower court for further factual findings of costs associated with individual arbitration, the Superior Court held mandatory individual arbitration unconsciona-

ble. when it actually prohibits consumer claims. The court said:

FN8    810 A.2d 643 (Pa.Super.2002).

[ ] ... the reservation by [the defendant] of access to the courts for itself to the exclusion of the consumer creates a presumption of unconscionability, which in the absence of "business realities" that compel inclusion of such a provision in an arbitration provision, renders the arbitration provision unconscionable and unenforceable under Pennsylvania law.[ ]

The *Lytle* Court held that if the costs associated with arbitrating a single claim effectively deny consumer redress, prohibiting class action litigation or class action arbitration is unconscionable.

Two years later, in *McNulty v. H & R Block,* 843 A.2d 1267, 1268 (Pa.Super.2004), the Superior Court reaffirmed this principle, holding that it was unconscionable to require individual arbitration and preclude class action litigation if the costs of arbitration effectively prevented an individual from pursuing a claim. The court said:

[ ]While there may be a select few who are so incensed by the notion of the e-filing fee they would spend significant time and $50.00 for the possibility of a $30.00 award, this is a situation where the costs of arbitration, minimal though they may seem, work to preclude the individual presentation of claims.[ ]

The court held:

[ ]As applied to the facts of this case, the enforcement of the arbitration provision would work to deny the allegedly injured parties' access to justice and is therefore unconscionable.[ ]

The high cost of arbitration compared with the minimal potential value of individual damages denied every plaintiff a

meaningful remedy. If class action litigation is the only effective remedy, a contract of adhesion cannot preclude such litigation.

Pennsylvania is not the only state which has addressed the preclusion of class action litigation in consumer contracts of adhesion. The California Court of Appeals recently ruled on the identical issue presented in these cases, finding that forced individual arbitration by precluding class actions is so one-sided as to be "blindingly obvious" and violated "fundamental notions of fairness." The plaintiff in *Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 118 Cal. Rptr.2d 862 (2002), challenged the mandatory individual arbitration and class action preclusion provisions of his customer agreement. The court found that because the effect of the enforcement of the agreement was corporate immunity, preclusion of class action litigation was unconscionable:

> [ ]This provision is clearly meant to prevent customers, such as Mr. Szetela and those he seeks to represent, from seeking redress for relatively small amounts of money, such as the $29 sought by Mr. Szetela. Fully aware that few customers will go to the time and trouble of suing in small claims court, [the defendant] has instead sought to create for itself virtual immunity from class or representative actions despite their potential merit, while suffering no similar detriment to its own rights.[ ]

The California court continued:

> [ ]The clause is not only harsh and unfair to Discover customers who might be owed a relatively small sum of money, but also serves as a disincentive for Discover to avoid the type of conduct that might lead to class action litigation in the first place. By imposing this clause on its customers, Discover has essentially granted itself a license to push the boundaries of good business practices to their furthest limits, fully aware that relatively few, if any, customers will seek legal remedies, and that remedies obtained will only pertain to that single customer without collateral estoppel effect. The potential for millions of customers to be overcharged small amounts without an effective method of redress cannot be ignored.[ ]

Class actions were created in response to public need. As early as 1854, the United States Supreme Court recognized that the representative nature of class action litigation serves a unique function in our judicial system. In *Smith v. Swormstedt*, [57 U.S.] 16 How. 288, 303, 14 L.Ed. 942 (1854), the Court wrote:

> [ ]Where the parties interested in the suit are numerous, their rights and liabilities are so subject to change and fluctuation by death or otherwise, that it would not be possible, without very great inconvenience, to make all of them parties, and would oftentimes prevent the prosecution of the suit to a hearing. For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court.[ ]

Class actions are still of great public importance. Class action lawsuits are and remain the essential vehicle by which consumers may vindicate their lawful rights. The average consumer, having limited financial resources and time, cannot individually present minor claims in court or in an arbitration. Our justice system resolves this inher-

ent inequality by creating the procedural device which allows consumers to join together and seek redress for claims which would otherwise be impossible to pursue. Both the Federal and Pennsylvania Rules of Civil Procedure delineate specific rules for publicly selected trial court judges to actively manage class action lawsuits through the public judicial system. Accordingly, under Pennsylvania law, the trial court judge remains responsible for all of the key procedural decisions that ensure fairness for named and unnamed plaintiffs in the class, even in a class action removed to class arbitration.

Federal Rule of Civil Procedure 23(g) and Pennsylvania Rule 1709 mandate that trial court judges ensure that the rights of all class members are adequately represented by counsel. Federal Rule 23(c)(2) and Pennsylvania Rule 1712 mandate that trial court judges approve class notification to ensure that absent plaintiffs receive adequate notice of class actions. Federal Rule 23(c)(2) and Pennsylvania Rule 1711 mandate that trial court judges ensure that class members who elect not to participate in the class action understand their rights. Federal Rule 23(e) and Pennsylvania Rule 1714 mandate that trial court judges approve of the terms of any settlement agreement. Federal Rule 23(e) and Pennsylvania Rule 1714 mandate that trial court approval is required before discontinuance. *Lytle v. Citi[F]inancial Services* mandates that state court judges determine the procedural setting within which trial court judges send cases to arbitration.

A fundamental principle of justice is "everyone should have a day in court." The Pennsylvania Constitution, Section 11, proclaims: "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law...." Most consumer complaints involve miniscule claims. No individual consumer possibly could or ever will individually litigate most consumer claims. The cost of lawyers, fees, and expert witnesses makes individual lawsuit or arbitration so completely impractical as to be fairly and properly characterized as impossible.

It is only the class action vehicle which makes small consumer litigation possible. Consumers joining together as a class pool their resources, share the costs and efforts of litigation and make redress possible. Should the law require consumers to litigate or arbitrate individually, defendant corporations are effectively immunized from redress of grievances.

[T]he Comcast [ ] customer [A]greement[ ] attempt[s] to preclude all class action litigation in court or in arbitration, and attempts to mandate that all customers arbitrate all claims as individuals. The Comcast [ ] customer [A]greement[ ] [is a] contract[ ] of adhesion unilaterally imposed on all consumers. Consumers including [ ] Mr. Thibodeau are subject to every term without choice.... Mr. Thibodeau was forced to accept every word of all 10 pages of the mass-delivered Comcast customer [A]greement or have no cable television service whatsoever, since Comcast holds a government-authorized geographic monopoly.

[ ]Mr. Thibodeau and [his] class members are claiming minimal damages.... Mr. Thibodeau and each of his class members allege they were unlawfully overcharged $9.60 per month. Everyone knows that these claims will never be arbitrated on an individual basis, either by the named plaintiffs or by any other of the millions of class members

they represent. No individual will expend the time, fees, costs and or other expenses necessary for individual litigation or individual arbitration for this small potential recovery. If the mandatory individual arbitration and preclusion of class action provisions are valid, Comcast [is] immunized from the challenges brought by [ ] Mr. Thibodeau, brought by any class member, or effectively from any minor consumer claims. It is clearly contrary to public policy to immunize large corporations from liability by allowing them to preclude all class action litigation or [ ] arbitration.

The preclusion of class wide litigation or class wide arbitration of ' consumer claims, imposed in a contract of adhesion, is unconscionable and unenforceable.

Trial Court Opinion, 1/24/06, at 6–17 (footnotes in original). We agree with the reasoning of the trial court, as set forth above, and conclude that Comcast is not entitled to relief on its first issue.

■■■ ¶ 18 In its second and third issues, Comcast argues that the trial court erred in failing to conduct a choice of law analysis and, consequently, erroneously applied Pennsylvania state law. Comcast asserts that the trial court was required to apply Massachusetts law, if it concluded that the FAA permitted application of state law, because Massachusetts had a greater interest. According to Comcast, the arbitration agreement at issue is enforceable under Massachusetts law because Massachusetts law requires a higher standard for unconscionability than Pennsylvania.

■■■ ¶ 19 Pursuant to the Pennsylvania choice of law analysis, the first step requires a determination of whether the laws of the competing states actually differ. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa.Super.2000).

If the laws do not differ, then a true conflict is not present and no further analysis is necessary. *Id.* In that case, we apply Pennsylvania law. If we determine that a true conflict is present, we must then analyze the governmental interests underlying the issue and determine which state has the greater interest in the application of its law to the matter at hand. *Id.*

¶ 20 In undertaking our analysis we must compare Pennsylvania and Massachusetts law concerning unconscionability. This Court has set forth the following discussion of Pennsylvania law:

An adhesion contract is defined as a standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms.

A finding that a contract is one of adhesion does not require that the court find the contract unconscionable. Even where a contract is found to be a contract of adhesion, the terms of the contract must be analyzed to determine whether the contract as a whole, or specific provisions of it, are unconscionable. Unconscionability requires a twofold determination: that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions. The issue of whether a contract is unconscionable is a question of law, as to which our scope of review is plenary. In order for a court to deem a contractual provision unconscionable, it must determine both that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions.

*Lytle*, 810 A.2d at 658–59 (citations and quotations omitted).

¶ 21 Application of Massachusetts law, in this instance, would not result in an outcome different than that mandated by the application of Pennsylvania law. Thus, a true conflict does not arise. Pursuant to Massachusetts law, unconscionability is also determined on a case by case basis "with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party and not to allocation of risk because of 'superior bargaining power.'" *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 292–93, 408 N.E.2d 1370 (1980). "If the sum total of the provisions of a contract drive too hard a bargain, a court of conscience will not assist in its enforcement." *Waters v. Min Ltd.*, 412 Mass. 64, 68, 587 N.E.2d 231 (1992).

¶ 22 In this case, the application of the arbitration clause would result in unfair surprise to Thibodeau. As the trial court explained, Thibodeau was originally a customer of AT & T Broadband. When Comcast acquired AT & T Broadband, it provided the AT & T Broadband customers with a new contractual Agreement. The old AT & T and new Comcast Agreements were virtually identical in terms of style, font size, type and layout. The only aesthetic difference between the two Agreements was a small icon on the first page. On the Comcast Agreement, the Comcast logo replaced the AT & T logo. Despite the fact that documents appeared at first glance to be almost identical, buried on page 8 of the 10–page document was a new and substantially different arbitration clause. Under these circumstances, we agree with the trial court that the application of this arbitration clause would result in unfair surprise to the consumer. Accordingly, pursuant to Massachusetts law, the application of this arbitration clause would also be determined to be unconscionable. Because no true conflict exist-

ed, we conclude that the trial court did not err in applying Pennsylvania law.

¶ 23 In its final issue, Comcast asserts that the trial court erred in concluding that the consumer arbitration Agreement was an unconscionable contract of adhesion. As we have previously discussed in relation to Comcast's first issue, we conclude that this argument lacks merit. Accordingly, Comcast is not entitled to relief.

¶ 24 Order affirmed; jurisdiction relinquished.