

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-19-2007

# Gay v. CreditInform

Precedential or Non-Precedential: Precedential

Docket No. 06-4036

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Gay v. CreditInform" (2007). *2007 Decisions*. Paper 5.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/5

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-4036

MARY GAY, ON BEHALF OF HERSELF AND
ALL OTHERS SIMILARLY SITUATED,

Appellant

v.

CREDITINFORM; INTERSECTIONS, INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 05-cv-06729)
Honorable James T. Giles, District Judge

Argued October 17, 2007

BEFORE: FISHER, ALDISERT and
GREENBERG, Circuit Judges

(Filed December 19, 2007)

James A. Francis (argued)
Francis & Mailman
Suite 208
100 South Broad Street
Land Title Building, 19th Floor
Philadelphia, PA 19110

David A. Searles
Donovan Searles
Suite 1100
1845 Walnut Street
Philadelphia, PA 19103

Attorneys for Appellant Mary Gay

Carleton O. Strouss
David R. Fine (argued)
Kirkpatrick & Lockhart Preston Gates Ellis
Market Square Plaza
17 North Second Street
Harrisburg, PA 17101

Attorneys for Appellee Intersections Inc.

Christopher D. Thomas
Nixon Peabody
P.O. Box 31051
Clinton Square
Rochester, NY 14603

Attorneys for Amicus-Appellee National Organization of
Consumer Credit Attorneys

_____

OPINION OF THE COURT

_____

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This case arises from appellant Mary Gay's purchase of credit repair services from defendants CreditInform and Intersections Inc. ("Intersections"). Gay, however, filed a notice

of voluntary dismissal as to Credit<u>Inform</u> on April 14, 2006,[1] and, accordingly, we will refer to Intersections as though it has been the sole defendant throughout the proceedings in the District Court and here. Gay claims that in selling its services Intersections violated its obligations under the Credit Repair Organizations Act, 15 U.S.C. §§ 1679, <u>et</u> <u>seq.</u> ("CROA"), and the Pennsylvania Credit Services Act, 73 Pa. Cons. Stat. Ann. §§ 2181, <u>et</u> <u>seq.</u> (West 1993) ("CSA").[2] In addition to allegations concerning her purchase of the credit repair services from Intersections, Gay's complaint includes allegations supporting prosecuting the case as a class action. Nevertheless, in response to Intersections' motion to stay the case and compel arbitration, the District Court ordered the parties to arbitrate the dispute on an individual basis pursuant to an arbitration provision included in Gay's purchase agreement ("Agreement") for the credit repair services.

Gay appeals from the District Court's order as she contends that under both the CROA and the CSA she has a right to assert her claims in a judicial forum and that under the CROA she has a right to bring her case as a class action. She further argues that both

---

[1]Credit<u>Inform</u> is not a legal entity but merely is a trademark Capital One has registered through which to market products and services through Capital One Services, Inc. Intersections then provides the products and services. Gay filed the notice of dismissal as to Capital One Services, Inc. We are uncertain as to the relationship, if any, between Intersections and Capital One.

[2]In its brief on this appeal, after describing the background of the CROA, Intersections includes the following footnote: "Intersections notes that there are credit-repair businesses that comply with the CROA. Intersections' products, however, are not credit-repair products and thus are not governed by the CROA." Appellee's br. at 5 n.3. Rather, it indicates that it supplies a "credit-monitoring product." <u>Id</u>. at 5. Gay disputes this contention, stating that "Intersections falls squarely within the definition of a credit repair organization and CROA's coverage." Reply br. at 2. Inasmuch as Intersections, notwithstanding its claim that the CROA does not apply to it, treats the CROA as applicable in this case, we will do the same.

3

statutes prohibit a consumer of services that those statutes regulate from waiving those rights. Alternatively, Gay argues that even if the statutes do not provide her with these nonwaivable rights, the arbitration provision in her Agreement with Intersections does not include her claims and is unconscionable and therefore a court should not enforce it. The Supreme Court and, as far as we are aware, no court of appeals has addressed the issues that we now address under the CROA.

For reasons that we will discuss, we will affirm the District Court's order to stay the proceedings and compel arbitration on an individual basis.

## II. FACTS AND PROCEDURAL HISTORY

Gay alleges that on or about January 21, 2005, she entered into her Agreement with Intersections for the purchase of services related to monitoring and improving her credit history. Gay further alleges that between February 2005 and September 2005, she made monthly payments of $4.99 to Intersections pursuant to the Agreement. According to Gay, she made the payments before Intersections fully performed any services for her. Gay claims that Intersections violated the CROA by requiring her to pay for credit repair services before it rendered them, and violated the CROA and CSA by requiring her to waive certain rights and protections that the statutes afforded to her as a consumer of a product governed by them. Gay also claims that Intersections violated the CROA and the CSA by failing to make disclosures that the statutes required. Additionally, as we have indicated, she makes allegations in support of class action treatment of her claims.

Intersections filed its motion on February 27, 2006, to stay the case and compel arbitration pursuant to the arbitration provision in the Agreement that states:

> Any claim arising out of or relating to the Product shall be settled by binding arbitration in accordance with the commercial arbitration rules of the

4

> American Arbitration Association on an individual basis not consolidated with any other claim.

J.A. at 98. As we have indicated, on June 12, 2006, the District Court granted the motion, stayed the case, and ordered the parties to submit their dispute to arbitration on an individual basis.

Gay subsequently moved to certify the District Court's order for an interlocutory appeal, and on June 29, 2006, the District Court granted her motion. Gay then petitioned us to accept her interlocutory appeal and we granted Gay's petition on August 30, 2006.

## III. JURISDICTION

The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1292(b).[3]

We exercise plenary review over legal questions concerning the applicability and scope of an arbitration agreement. Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 53 (3d Cir. 2001). If we reviewed the District Court's interpretation as distinguished from construction of the Agreement, we would apply the clearly erroneous standard. We are not concerned, however, with the sometimes elusive distinction between contractual interpretation and construction as there can be no question that, as we explain below, as written the arbitration clause includes Gay's claim. See id. at 53 n.2.

---

[3]Although 9 U.S.C. § 16(b) provides that "an appeal may not be taken from an interlocutory order . . . directing arbitration to proceed under section 4 of this title," the provision creates an exception for appeals taken pursuant to 28 U.S.C. § 1292(b).

## IV. DISCUSSION

A.    Did the District Court err in holding that Gay's claims based on the CROA, 15 U.S.C. §§ 1679, et seq., and the CSA, 73 Pa. Cons. Stat. Ann. §§ 2181, et seq., are subject to arbitration?

### 1. The parties' arguments

Gay argues that her claims are not arbitrable because both the CROA and the CSA protect a consumer's right to assert her claims in a judicial forum, and the CROA further protects a consumer's right to prosecute her claim on a class action basis. Thus, in her view, there are irreconcilable conflicts between the statutes on the one hand and the arbitration provision in the Agreement on the other hand. She also argues that the arbitration provision does not cover her claims, and that, in any event, it is unconscionable and unenforceable.

Preliminarily we reject out of hand her contention that the arbitration provision does not cover her claims. As we explain below, a court determines whether the parties have agreed to submit a dispute to arbitration. It is perfectly clear that the arbitration provision in Gay's Agreement which covers "[a]ny claim arising out of or relating to the Product" includes Gay's claims. Thus, we pass to the more substantial issues raised on this appeal.

In contending that the statutes preclude arbitration of her claims, Gay points to 15 U.S.C. § 1679g, the CROA provision which prescribes the bases for determining civil liability and includes several references to a "court" and class actions in its discussion of punitive damages. In particular, section 1679g(a)(2) states:

> (2) Punitive damages
>
> (A) Individual actions
>
> In the case of any action by an individual, such additional amount as

6

the court may allow.

(B) Class actions

In the case of a class action, the sum of –

(i) the aggregate of the amount which the court may allow for each named plaintiff; and

(ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.Gay also refers to section 1679g(b), which prescribes the factors to be considered in awarding punitive damages and states:

(b) Factors to be considered in awarding punitive damages

In determining the amount of any liability of any credit repair organization under subsection (a)(2) of this section, the court shall consider, among other relevant factors –

(1) the frequency and persistence of noncompliance by the credit repair organization;

(2) the nature of the noncompliance;

(3) the extent to which such noncompliance was intentional; and

(4) in the case of any class action, the number of consumers adversely affected.

Gay argues that we should construe section 1679g's references to a "court" and class actions in a way that recognizes that the CROA grants a consumer a right to file suit for an alleged violation of the statute in a judicial forum on a class action basis.[4]

Gay similarly argues that 73 Pa. Cons. Stat. Ann. § 2191 grants a consumer the right to sue for an alleged CSA violation in a judicial forum. That section states:

> Any buyer or borrower injured by a violation of this act or by the credit services organization's or loan broker's breach of a contract subject to this act may bring an action for recovery of damages. Judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer or borrower to the credit services organization or loan broker, plus reasonable attorney fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages.

---

[4]Gay also argues that 15 U.S.C. § 1679c(a) supports her argument that the CROA creates a right for a consumer to bring suit in a judicial forum. That section provides that an agreement for services governed by the CROA must include a recital providing that: "You have a right to sue a credit repair organization that violates the Credit Repair Organization Act." But the section does not specify the forum for the resolution of the dispute and therefore does not support Gay's argument that the CROA provides a consumer with the right to bring suit in a judicial, rather than an arbitral, forum for CROA violations. Moreover, even if the use of the word "sue" implies the availability of a judicial forum for an action against a credit repair organization, use of the word would not mean that the organization could not assert defenses that it had to such an action including the right to invoke a contractual arbitration provision to change the forum.

8

As with the CROA, Gay argues that the CSA's reference to a "court" provides a consumer with the right to assert CSA claims in a judicial forum. We note, however, that Gay does not point to language in the CSA to support an argument that it, like the CROA, provides a consumer with the right to bring suit on a class action basis.

In addition to arguing that the statutes create a right for a consumer to an adjudication in a judicial forum, and that the CROA gives a consumer the further right to proceed in a class action, Gay contends that the statutes prohibit a consumer from waiving those rights. Gay refers to a provision of the CROA which provides:

> (a) Consumer waivers invalid
>
> Any waiver by any consumer of any protection provided by or any right of the consumer under this subchapter–
>
> (1) shall be treated as void; and
>
> (2) may not be enforced by any Federal or State court or any other person.
>
> (b) Attempt to obtain waiver
>
> Any attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this subchapter shall be treated as a violation of this subchapter.
>
> (c) Contracts not in compliance
>
> Any contract for services which does not comply with the applicable provisions of this subchapter –

9

> (1) shall be treated as void; and
>
> (2) may not be enforced by any Federal or State court or any other person.

15 U.S.C. § 1679f.

Gay also refers to the CSA anti-waiver provision which provides:

> (a) Waiver – Any waiver by a buyer or borrower of the provisions of this act shall be deemed contrary to public policy and shall be void and unenforceable. Any attempt by a credit services organization or a loan broker to have a buyer or borrower waive rights given by this act shall constitute a violation of this act.

73 Pa. Cons. Stat. Ann. § 2189(a).

Intersections' answer to Gay's claims is straightforward. It argues that the arbitration provision governs Gay's claims and is enforceable. Moreover, it contends that neither the CROA nor the CSA provides a consumer with the right to bring suit for its alleged violation in a judicial forum or on a class action basis. It also argues that the statutes' anti-waiver provisions do not preclude a consumer from waiving whatever right she might have to bring an action in a court individually or on a class action basis, and that a consumer therefore may agree to submit her claims to arbitration.[5]

---

[5] The National Organization of Consumer Credit Attorneys filed an <u>amicus curiae</u> brief in opposition to this appeal. In arguing that the District Court's order compelling arbitration should be affirmed, it makes essentially the same arguments as Intersections, namely, that the CROA does not prohibit arbitration of claims brought pursuant to the statute and that the CROA's anti-waiver statute does not extend to a right either to bring suit in a judicial

10

2. The enforcement of arbitration agreements for statutory claims

Of course, this case implicates the Federal Arbitration Act ("FAA") which provides that:

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.[6] Congress enacted the FAA "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.Ct. 1647, 1651 (1991).

The circumstance that Gay's claims are statutory does not mean that the Agreement could not specify that the parties to it would submit their controversies, if any, arising from it to arbitration for resolution. Id. at 26, 111 S.Ct. at 1652 ("It is by now clear that statutory claims may be the subject of an arbitration

_____

forum or to proceed on a class action basis. Though it approaches the case from the perspective of attorneys who assist clients with credit problems, in addressing both its and Intersections' arguments, as a matter of convenience we will refer only to Intersections' brief.

[6]Gay does not contend that the Agreement is not "a contract evidencing a transaction involving commerce." In fact she asserts that Intersections "used instrumentalities of interstate commerce" in marketing and performing its services. Appellant's br. at 2.

agreement, enforceable pursuant to the FAA."); see also Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337 (1987) ("This duty [of the courts] to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights."); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3354 (1985) ("There is no reason to depart from these guidelines [for enforcing arbitration agreements] where a party bound by [such an] agreement raises claims founded on statutory rights.").  But even though statutory claims are subject to arbitration agreements, "[l]ike any statutory directive, the [FAA]'s mandate may be overridden by a contrary congressional command."  McMahon, 482 U.S. at 226, 107 S.Ct. at 2337.

A party seeking to avoid arbitration for a statutory claim has the burden of establishing that Congress intended to preclude arbitration of the claim.  Congress's intention "may be found in the text, legislative history, or in an 'inherent conflict' between arbitration and the statute's underlying purposes."  Johnson v. W. Suburban Bank, 225 F.3d 366, 371 (3d Cir. 2000) (quoting Gilmer, 500 U.S. at 26, 111 S.Ct. at 1652); see also Gilmer, 500 U.S. at 26, 111 S.Ct. at 1652 ("Although all statutory claims may not be appropriate for arbitration, having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.") (internal quotation marks and citation omitted). "Throughout such an inquiry, it should be kept in mind that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  Johnson, 225 F.3d at 371 (quoting Gilmer, 500 U.S. at 26, 111 S.Ct. at 1652).

As we have indicated, Gay argues that the CROA and the CSA both provide a consumer with the statutory right to bring suit in a judicial forum, and that the CROA provides her with the additional right to assert claims pursuant to the statute on a class action basis.  As we further have indicated, she rests her argument on the provisions of both statutes that contain references to a "court" in describing both the relief available to a consumer and the forum for obtaining it, as well as on the CROA's explicit reference to class actions.

Gay, however, is confronted with Johnson in which we rejected a similar argument under another consumer protection statute. There we considered whether the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, et seq., prohibited the parties to an agreement subject to the statute from agreeing to arbitrate claims asserted pursuant to the statute. The plaintiff in Johnson argued that the TILA's repeated references to "class action[s]" granted consumers a statutory right to file TILA claims on a class action basis, and that an arbitration agreement abrogating those rights therefore was in irreconcilable conflict with the statute. In our analysis, although we addressed only the third method identified in McMahon by which Congress can demonstrate its intention to preclude arbitration, i.e., inherent conflict between the allowance of the arbitration of a dispute and the statute's underlying purposes, we noted that "[b]oth the statute and the legislative history . . . offer insight into the question whether an 'inherent conflict' is to be found between the statute and arbitration." Johnson, 225 F.3d at 371.

We began our analysis in Johnson by discussing the statutory language, observing that the TILA allowed plaintiffs to recover:

> in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor.

Id. (quoting 15 U.S.C. § 1640(a)(2)(B)). The statute further stated that:

> [i]n determining the amount of award in any class action, the court shall consider, among other relevant

13

> factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

Id. (quoting 15 U.S.C. § 1640(a)). The plaintiff argued that section 1640's multiple references to class actions demonstrated that Congress intended to provide a consumer with the right to bring TILA claims on a class action basis, and that the enforcement of the arbitration agreement would deprive him of that right.

We rejected that argument, observing that while "the statute clearly contemplates class actions, there are no provisions within the law that create a right to bring them, or evince an intent by Congress that claims initiated as class actions be exempt from binding arbitration clauses." Id. We explained that "[t]he 'right' to proceed to a class action, insofar as the TILA is concerned, is a procedural one that arises from the Federal Rules of Civil Procedure," rather than from the TILA. Id.

Next, the plaintiff in Johnson argued that the legislative history of the TILA demonstrated the "centrality of class actions" to the enforcement of the statute. Id. at 373. In discussing the legislative history, we noted that Congress responded to a reluctance by the courts to hear TILA class action claims by enacting limitations on the amounts recoverable in class actions, and that it thereby acknowledged "the potential role that class actions are meant to play in the enforcement of the TILA's substantive requirements." Id. at 372. We also noted that several years later Congress again addressed the role of class actions in the enforcement of the TILA by raising the limits for class action recoveries. Nonetheless, we concluded that "nothing in the legislative history . . . clearly expresses congressional intent to preclude the ability of parties to engage in arbitration," and that the plaintiff therefore must "demonstrate that arbitration irreconcilably

14

conflicts with the purposes of the TILA."[7]  Id. at 373.

Finally, the plaintiff in Johnson argued that there was an irreconcilable conflict between the role of class actions in TILA's enforcement scheme and the arbitration of such claims because Congress intended the statute "to encourage private attorneys general, and the statute as a whole [was] intended for public purposes rather than private grievances."  Id.  We rejected that argument, stating that even if plaintiffs waive their right to proceed as part of a class, "they retain the full range of rights created by the TILA," and that "[t]hese rights remain available in individual arbitration proceedings."  Id.  We explained:

> Under the prevailing jurisprudence, when the right made available by a statute is capable of vindication in the arbitral forum, the public policy goals of that statute do not justify refusing to arbitrate.  The notion that there is a meaningful distinction between vindicating a statute's social purposes and adjudicating private grievances for purposes of determining whether a statute precludes compelling arbitration under a valid arbitration clause was rejected by the Supreme Court in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

Id. at 374.

We noted in Johnson that although arbitration of cases that

---

[7]In Johnson, we interchangeably used the terms "inherent conflict," which the Supreme Court used in Gilmer, 500 U.S. at 26, 111 S.Ct. at 1652, and "irreconcilable conflict," which the parties used in Johnson.  225 F.3d at 373.  In keeping with our language in Johnson, we will continue using the term "irreconcilable conflict" in this opinion.

15

otherwise might have proceeded as class actions "potentially reduces the number of plaintiffs seeking to enforce the TILA against creditors, arbitration does not eliminate plaintiff incentives to assert rights under the Act." Id. We observed that "[t]he sums available in recovery to individual plaintiffs are not automatically increased by use of the class forum," and that insofar as attorneys could recover fees pursuant to the TILA, there was reason to believe that the supply of attorneys would remain sufficient for arbitration proceedings. Id. We concluded that "[although] pursuing individual claims in arbitration may well be less attractive than pursuing a class action in the courts, we do not agree that compelling arbitration of the claim of a prospective class action plaintiff irreconcilably conflicts with TILA's goal of encouraging private actions to deter violations of the Act." Id. at 374-75.

In Johnson, in concluding that there was not an irreconcilable conflict between the role of class actions in the enforcement of the statute and the arbitration of a plaintiff's claims, we also considered the TILA's administrative enforcement provisions to be significant. After identifying the different administrative enforcement mechanisms that the TILA provided, we explained that while "[i]t may be true that Congress saw value in maintaining the availability of class actions, . . . that does not translate to the conclusion that it intended to preclude private parties from contracting around their availability." Id. at 375.

We recognized that:

> When [legislative] history is used . . . merely to demonstrate that the judicial remedies provided for or contemplated by a statute are important, it is of noticeably reduced value. The importance of statutory judicial remedies [is] always evident from their mere existence – Congress obviously enacted them for a reason. Were they not the object of a congressional goal, they would not have been enacted . . . . Insofar as Congress's intent, broadly

16

> contemplated, is concerned, we must give equal consideration to Congress's policy goals in enacting the FAA.

Id. at 375-76. We explained that "[the plaintiff's] reliance on the legislative history . . . is fundamentally flawed" because he used it only "to show that class actions have important purposes under the statute," but failed to identify any passages demonstrating that parties cannot choose to waive judicial remedies in favor of arbitration. Id. at 376. We observed that though "[i]t may be true that the unavailability of class actions removes an incentive for lenders to comply with the statute, . . . it is far from the only incentive to do so." Id.

We reiterate that Gay relies on the CROA and the CSA references to a "court" and class actions in arguing that the statutes give consumers a right to pursue these procedures. Although the statutes clearly contemplate consumers' actions being brought in a judicial forum and, in the case of the CROA, on a class action basis, and to that extent may be said to recognize a consumer's right to proceed in court, they neither contain provisions creating such rights nor indicate that Congress or the Pennsylvania Legislature, respectively, intended to exclude claims asserted under the CROA or the CSA from arbitration agreements.[8] Rather than creating substantive rights the statutes merely recognize that a party who believes she has been wronged may bring an action in a court seeking a remedy for her injuries and may do so on a class action basis if she satisfies the criteria for bringing such an action. This recognition is hardly surprising because ordinarily persons considering themselves to have been wronged may seek judicial remedies. Moreover, whatever role judicial forums and class actions may have in the enforcement of the substantive requirements of the respective statutes, Gay has not identified anything in the legislative history of either statute that "clearly expresses [legislative] intent to preclude the ability of parties to

---

[8]Our conclusion on this point with respect to the Legislature relieves us of the need to consider whether there is a conflict between the CSA and the FAA. See Southland Corp. v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 861 (1984).

17

engage in arbitration . . . ." Id. at 373.

Significantly, Gay does not demonstrate that there is an irreconcilable conflict between requiring a consumer to arbitrate her claims and the enforcement of either the CROA or the CSA. If this case proceeds to arbitration instead of litigation in a judicial forum, Gay will "retain the full range of rights created by [the statutes]," and "[t]hese rights remain available in individual arbitration proceedings." Id.; see also Mitsubishi, 473 U.S. at 628, 105 S.Ct. at 3354 ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").

Furthermore, as is particularly germane to the claimed right to bring this case as a class action, as we observed with respect to the TILA in Johnson, the CROA provides for the administrative enforcement of the rights created by the statute. The CROA provides that "[c]ompliance with the requirements imposed under this subchapter with respect to credit repair organizations shall be enforced under the Federal Trade Commission Act [15 U.S.C. §§ 41, et seq.] by the Federal Trade Commission." 15 U.S.C. § 1679h(a). In particular, section 1679h(b)(1) states that "any violation of any requirement or prohibition imposed under this subchapter with respect to credit repair organizations shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act [15 U.S.C. §§ 45(a), et seq.]." 15 U.S.C. § 1679h(b)(1). The CROA also grants the states authority to enforce the statute, providing that:

> In addition to such other remedies as are provided under State law, whenever the chief law enforcement officer of a State, or any official or agency designated by a State, has reason to believe that any person has violated or is violating this subchapter, the State –
>
> (A) may bring an action to enjoin such violation;

18

> (B) may bring an action on behalf of its residents to recover damages for which the person is liable to such residents under section 1679g of this title as a result of the violation; and
>
> (C) in the case of any successful action under subparagraph (A) or (B), shall be awarded the costs of the action and reasonable attorney fees as determined by the court.

15 U.S.C. § 1679h(c). Clearly, these provisions for administrative enforcement supply procedures for obtaining remedies reasonably substituting for those available in a class action.

Moreover, it is important to recognize that the right of any injured party to sue in court and, in an appropriate case, to do so on a class action basis, is inherent when a statutory substantive right is created as a party conceiving herself to be wronged would have had a right to sue in a court and, in an appropriate case, to do so on a class action basis, that would have preexisted the newly created substantive right allegedly infringed. Thus, when Congress or a legislature creates a statutory substantive right a party injured by a statutory violation may seek her remedy for its violation in court, and, if the ordinary criteria specified by the Federal Rules of Civil Procedure or the parallel state rules are satisfied, may do so on a class action basis, unless Congress or the legislature, as the case may be, validly precludes her from doing so.[9] Accordingly, identification of a court as a forum for an allegedly wronged party to seek relief adds nothing to the statute helpful to resolution of the issue before us, i.e., whether a party consensually may bind herself to arbitrate her claims for injuries resulting from violation of the statutes.

---

[9]We say "validly" because a state law expressly precluding arbitration might not be valid as the FAA could preempt an anti-arbitration clause. See supra note 8. We are not concerned with resolution of a situation of that type here as the CSA, in terms, does not preclude arbitration.

We reiterate that Gay argues that the CROA and the CSA both prohibit the waiver of rights the respective statutes have created, in particular a consumer's right to assert her claims in a judicial forum and, in the case of the CROA, a consumer's right to proceed on a class action basis. But even if the CROA's and the CSA's references to a "court," and the CROA's references to class actions, give consumers rights to proceed in a judicial forum on a class action basis and thus may be said to be broader than we construe them to be, we then would have to determine whether consumers may waive such rights, i.e., whether the rights would fall outside of the statutes' respective anti-waiver provisions. As we will explain, at least with respect to the CROA, the statute's anti-waiver provision as a matter of legislative intent would not apply to a right to assert claims in a judicial forum or on a class action basis, and a consumer asserting claims pursuant to the CROA may therefore waive such rights.[10]

The Supreme Court addressed a similar issue in McMahon in considering whether section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a), prohibited arbitration agreements. The Court acknowledged that section 27 of the Act provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction of violations of this [chapter] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this [chapter] or the rules and regulations thereunder." McMahon, 482 U.S. at 227, 107 S.Ct. at 2338 (quoting 15 U.S.C. § 78aa). Furthermore, section 29(a) declares void "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of [the Act]." Id. (quoting 15 U.S.C. § 78cc(a)). The plaintiffs in McMahon argued that section 29(a) prohibited waiver of the right

---

[10]There is nothing for a consumer to waive under our understanding of the provisions of the statutes dealing with judicial forums and class actions for, as we have explained, the rights to judicial forums and class action resolution of disputes exist outside of the statutes. Consequently, at this point, in discussing waiver of rights we are treating the statutes as creating rights to bring actions in judicial forums and, in the case of the CROA, to do so on a class action basis, though we have concluded that they do no such thing.

to bring suit in a federal district court pursuant to section 27.

The Supreme Court rejected that argument, stating that "[w]hat the antiwaiver provision of § 29(a) forbids is enforcement of agreements to waive 'compliance' with the provisions of the statute," and that "§ 27 itself does not impose any duty with which persons trading in securities must 'comply.'" Id. at 228, 107 S.Ct. at 2338. The Court distinguished between the procedural right that section 27 provided, namely, the right to file an action in a federal district court, and the substantive rights that section 29(a) provided. As the Court explained, "[b]y its terms, § 29(a) only prohibits waiver of the substantive obligations imposed by the Exchange Act," and "[b]ecause § 27 does not impose any statutory duties, its waiver does not constitute a waiver of 'compliance with any provision' of the Exchange Act under § 29(a)." Id., 107 S.Ct. at 2338.

Similarly, in Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917 (1989), the Court addressed the question of whether section 14 of the Securities Act, 15 U.S.C. § 77n, prohibited arbitration of claims brought pursuant to section 12(2) of the Act. Section 14 provides:

> Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

15 U.S.C. § 77n. The Court had answered the arbitration question 36 years earlier in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182 (1953), when it held that section 14's prohibition against waiving compliance with the statute extended to agreements for arbitration of disputes. Id. at 435, 74 S.Ct. at 186. But the Court revisited the issue in Rodriguez de Quijas and overruled Wilko. After acknowledging "[t]he shift in the Court's views on arbitration away from those adopted in Wilko," the Court determined that "[o]nce the outmoded presumption of disfavoring arbitration proceedings is set to one side, it becomes clear that the right to select the

judicial forum and the wider choice of courts are not such essential features of the Securities Act that § 14 is properly construed to bar any waiver of these provisions." Rodriguez de Quijas, 490 U.S. at 481, 109 S.Ct. at 1920.

In Rodriguez de Quijas the Court distinguished between substantive provisions in the statute, e.g., the requirement that a seller prove a lack of scienter in a claim of fraud, 15 U.S.C. § 77*l*, and procedural provisions, e.g., providing for venue in the federal courts, the existence of nationwide service of process in the federal courts, the extinction of the amount-in-controversy requirement for fraud suits based on diversity jurisdiction, and the grant of concurrent jurisdiction in state courts. The Court held that "[t]here is no sound basis for construing the prohibition in § 14 on waiving 'compliance with any provision' of the Securities Act to apply to these procedural provisions." Rodriguez de Quijas, 490 U.S. at 482, 109 S.Ct. at 1920; see also Mitsubishi, 473 U.S. at 628, 105 S.Ct. at 3354 ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").

The CROA provides that:

> Any waiver by any consumer of any protection provided by or any right of the consumer under this subchapter –
>
> (1) shall be treated as void; and
>
> (2) may not be enforced by any Federal or State court or any other person.

15 U.S.C. § 1679f. Significantly, the section in which this anti-waiver provision appears is entitled "Noncompliance with this subchapter." Id. It is appropriate for us to consider this title for the Supreme Court in Almendarez-Torres v. United States, 523 U.S. 224, 234, 118 S.Ct. 1219, 1226 (1998), "note[d] that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal

22

quotation marks and citation omitted).

Clearly, even Gay recognizes that this title is important as she set it forth in her brief in bold type thus ensuring that we would not overlook it. Appellant's br. at 9. It appears, then, that the CROA's anti-waiver provision is no broader than the anti-waiver provisions that the Supreme Court considered in McMahon and Rodriguez de Quijas, which extended to "compliance with any provision" of the Exchange Act and the Securities Act, respectively, but which the Court nevertheless held did not extend to the right to sue in a judicial forum. As with the "compliance with any provision" to which the anti-waiver clauses in McMahon and Rodriguez de Quijas refer, under the CROA, a claimant may not waive the "protection[s]" provided by the statute which, if violated, would constitute "[n]oncompliance with" the statute. We therefore construe the CROA's anti-waiver provision as only extending to rights premised on the imposition of statutory duties, absent contrary language in the statute. See McMahon, 482 U.S. at 228, 107 S.Ct. at 2338 ("Because § 27 does not impose any statutory duties, its waiver does not constitute a waiver of 'compliance with any provision' of the Exchange Act under § 29(a).").

In contrast, we note that as a matter of statutory interpretation, the anti-waiver provision in the CSA does not limit itself to rights based on compliance with the statute and therefore is broader than the provisions which the Supreme Court discussed in McMahon and Rodriguez de Quijas. Nevertheless, even if we interpret the CSA anti-waiver provision as granting consumers with the right to assert claims pursuant to the statute in a judicial forum and not be subject to arbitration defenses, the anti-waiver provision probably would be invalid in this respect. We make this point for the Supreme Court has stated with respect to the FAA that "[i]n creating a substantive rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." Southland Corp v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 861 (1984). But we emphasize that the question of what the Pennsylvania Legislature intended to do is separate from what it has the power to do. We further emphasize that even if we are wrong with respect to the scope of the CROA anti-waiver provision or the

validity of the CSA anti-waiver provision, our result in this case would not change because the statutes did not create the underlying rights, i.e., the right of consumers to sue in a judicial forum and, in the case of the CROA, the right to do so on a class action basis.[11]

### B. Did the District Court err in enforcing the arbitration provision in her Agreement with Intersections?

Gay argues that to the extent that claims brought pursuant to the CROA and the CSA may be arbitrated, the arbitration provision in this case does not apply by its terms to her claims, an argument that we rejected above, and further contends that even if it does apply as written, the provision is unconscionable and therefore a court should not enforce it. Beyond the arbitration provision, Gay also argues that pursuant to 15 U.S.C. § 1679f(c), the entire agreement is void and should not be enforced. Intersections answers that the arbitration provision is applicable and that Gay has waived her argument that the provision is unconscionable under the CROA because she failed to raise that argument in the District Court. It acknowledges, however, that Gay preserved the unconscionabilty issue with respect to the CSA by raising it in the District Court but contends that it is not unconscionable. We have examined the record and agree with Intersections on the waiver argument and thus will consider the unconscionability issue only under the CSA.[12]

---

[11]The parties spend considerable space in their briefs discussing <u>Alexander v. U.S. Credit Management, Inc.</u>, 384 F. Supp.2d 1003 (N.D. Tex. 2005), a case that undoubtedly supports Gay's contentions, but we will not do so as it does not bind us and we do not agree with it.

[12]We note, however, that we cannot comprehend in view of the consistent purposes and provisions in the CROA and the CSA how we would reach a different result under the two statutes if we had considered Gay's CSA unconscionability argument under the CROA. We reach this conclusion even though Intersections, in contending that Gay's CSA unconscionability argument does not apply to the CROA, correctly states that "one cannot simply argue that a provision is unconscionable with respect to one statute and

In reviewing the District Court's decision to compel arbitration, we are limited to a "narrow scope" of inquiry. <u>Great W. Mortgage Corp. v. Peacock</u>, 110 F.3d 222, 228 (3d Cir. 1997). As we have explained:

> Under the FAA the district court must be satisfied that the parties entered into a valid arbitration agreement. In conducting this inquiry the district court decides only whether there was an agreement to arbitrate, and if so, whether the agreement is valid. In so deciding, the district court is not to consider the merits of the claims giving rise to the controversy, but is only to determine, as we have stated, whether there is a valid agreement to arbitrate. Once such an agreement is found, the merits of the controversy are left for disposition to the arbitrator.

<u>Id.</u> (internal citations omitted). As the Supreme Court has explained, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 445-46, 126 S.Ct. 1204, 1209 (2006); <u>see also</u> <u>Medtronic AVE</u>, 247 F.3d at 54-55 ("While a court asked to stay proceedings pending arbitration must determine whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement, '[its] function [nevertheless] is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.'") (quoting <u>United Steelworkers of Am. v. Am. Mfg. Co.</u>, 363 U.S.

---

assume that the argument applies to all statutes." Appellee's br. at 33 n.16. Though we agree that such an assumption cannot be made, certainly the same result can be reached after analysis of complementary statutes.

564, 567-68, 80 S.Ct. 1343, 1346 (1960)); PaineWebber Inc. v. Hofmann, 984 F.2d 1372, 1381 (3d Cir. 1993) ("'Whether 'arguable' or not, indeed even if it appears to the court to be frivolous,' the merits of an arbitrable claim is for the arbitrators to decide.") (quoting AT&T Techs. v. Commc'ns Workers of Am., 475 U.S. 643, 649-50, 106 S.Ct. 1415, 1419 (1986)).

We recently have described the proper scope of a court's inquiry in determining whether a case should be arbitrated. In Certain Underwriters at Lloyd's London v. Westchester Fire Insurance Co., 489 F.3d 580 (3d Cir. 2007), we summarized the limitations that a court faces in making such a determination:

> [T]he question of 'whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.' . . . [W]hereas one might call any potentially dispositive gateway question a 'question of arbitrability,' 'the phrase . . . has a far more limited scope.' Such questions of arbitrability are raised only in 'narrow circumstance[s]' where courts must determine 'gateway matter[s],' such as a dispute about 'whether the parties are bound by a given arbitration clause' or . . . 'a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'

Id. at 585 (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84, 123 S.Ct. 588, 592 (2002)). We observed that "'only when there is a question regarding whether the parties should be arbitrating at all' is a question of arbitrability raised for the court to resolve," and that "[i]n other circumstances, resolution by the arbitrator remains the presumptive rule." Id. (quoting

26

Dockser v. Schwartzberg, 433 F.3d 421, 426 (4th Cir. 2006)). This allocation of roles between courts and arbitrators promotes efficiency because "an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy – a goal of arbitration systems and judicial systems alike." Howsam, 537 U.S. at 85, 123 S.Ct. at 593.

In determining whether a matter should be arbitrated, "there is a strong presumption in favor of arbitration, and doubts 'concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Great W. Mortgage, 110 F.3d at 228 (quoting Moses H. Cone Mem'l Hosp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941 (1983)); see also Medtronic AVE, 247 F.3d at 55 ("An order to arbitrate 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'") (quoting United Steelworkers of Am. v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1353 (1960)). Nonetheless, "while interpretive disputes should be resolved in favor of arbitrability, a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." Medtronic AVE, 247 F.3d at 55 (internal quotations omitted).

Gay argues that both the arbitration provision and the Agreement as a whole are unconscionable. We are limited, however, to addressing the first issue, i.e., whether to enforce the arbitration provision. The question of whether the Agreement as a whole is unconscionable is a separate issue that, if we find that arbitration of the case would be appropriate, the arbitrator must decide.

In arguing that the arbitration provision is unconscionable, Gay relies on Pennsylvania law but Intersections argues that Virginia law applies because there is a choice-of-law provision in the Agreement that states: "These Terms of Use are governed by the laws of the Commonwealth of Virginia, USA, exclusive of its choice of law principles." J.A. at 98. Intersections argues that under Virginia law, and for that matter under Pennsylvania law should it apply, the arbitration provision is not unconscionable.

We begin our disposition of this issue by emphasizing the overarching principle that "[f]ederal law determines whether an issue governed by the FAA is referable to arbitration." Harris v. Green Tree Fin. Corp., 183 F.3d 173, 178 (3d Cir. 1999). "Questions concerning the interpretation and construction of arbitration agreements are determined by reference to federal substantive law." Id. at 179; see also Moses H. Cone Mem'l Hosp., 460 U.S. at 25 n.32, 103 S.Ct. at 942 n.32 ("[The FAA] creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate . . . ."). Section 2 of the FAA sets forth the basic rule of federal law:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

Nevertheless, notwithstanding the supremacy of federal law, courts repeatedly have held that "in interpreting [arbitration] agreements, federal courts may apply state law, pursuant to section two of the FAA." Harris, 183 F.3d at 179. In particular, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656 (1996). In applying ordinary state law principles to evaluate arbitration agreements, First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924 (1995), the cases have indicated that courts may look in particular to the laws of the involved state or territory. See, e.g., Parilla v. IAP Worldwide Servs. VI, Inc., 368 F.3d 269, 276 (3d Cir. 2004) (applying Virgin Islands law to determine whether arbitration agreement was enforceable in

lawsuit based on Title VII); <u>Spinetti v. Serv. Corp. Int'l</u>, 324 F.3d 212, 214 (3d Cir. 2003) (applying Pennsylvania law to determine whether arbitration agreement was enforceable in action based on Title VII and the ADEA); <u>Blair v. Scott Specialty Gases</u>, 283 F.3d 595, 603 (3d Cir. 2002) (applying Pennsylvania law to determine whether arbitration agreement was enforceable in lawsuit based on Title VII); <u>Harris</u>, 183 F.3d at 181-84 (applying Pennsylvania law to determine whether arbitration agreement was unconscionable in lawsuit based on RICO).[13]

The cardinal principle of the law of arbitration is that "under the [FAA, arbitration] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." <u>Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.</u>, 489 U.S. 468, 479, 109 S.Ct. 1248, 1256 (1989). That freedom extends to choice-of-law provisions governing agreements, including agreements to arbitrate. <u>See Trippe Mfg. Co. v. Niles Audio Corp.</u>, 401 F.3d 529, 532 (3d Cir. 2005) (applying New York law pursuant to choice-of-law provision in determining whether to enforce arbitration agreement); <u>Gen. Elec. Co. v. Deutz AG</u>, 270 F.3d 144, 155 (3d Cir. 2001) ("In general, we respect the choice of law that parties agree upon to resolve their private disputes."); <u>see also</u> <u>Suburban Leisure Ctr., Inc. v. AMF Bowling Prods., Inc.</u>, 468 F.3d 523, 526 (8th Cir.

---

[13]We recognize that courts including our court look to the law of the forum state or another state related to the circumstances of the dispute in determining as a matter of federal law whether an issue is referable to arbitration. Yet one might wonder why the consideration of state law is so confined. After all, if, as is the case, federal common law developed under the FAA is at issue then it is logical that the law should be uniform throughout the country. In this regard it could be asked whether federal common law should be one thing in a district court in California but be different in a district court in Pennsylvania. But if a further examination of that point ever is needed it will be at some later day as we have no need to consider it now. The need to examine the question might arise if a party contended that the law of an involved state to which a court might look in applying federal common law is aberrational.

2006) (applying Virginia law pursuant to choice-of-law provision after determining that both Virginia and the forum state of Missouri enforce choice-of-laws provisions); Overstreet v. Contigroup Cos., 462 F.3d 409, 411 (5th Cir. 2006) (applying Georgia law pursuant to choice-of-law provision in determining whether to enforce arbitration agreement); Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 872 (8th Cir. 2004) (applying Texas law pursuant to choice-of-law provision to determine whether to enforce arbitration agreement).

Gay challenges the choice-of-law provision in the Agreement providing that Virginia law governs its terms of use, but does not explain what state's law to apply in evaluating the provision. The Agreement is not helpful on this point as it provides that its selection of Virginia law with respect to its "terms of use" does not extend to Virginia choice-of-law principles. But inasmuch as Gay argues that Pennsylvania law governs the arbitration provision and the Agreement as a whole, it seems reasonable to use Pennsylvania law in evaluating the choice-of-law provision. The use of Pennsylvania law on this choice-of-law question is consistent with what we said in Spinetti that "[t]he federal policy encouraging recourse to arbitration requires federal courts to look first to the relevant state law of contracts . . . in deciding whether an arbitration agreement is valid under the FAA." 324 F.3d at 214. Furthermore, if the District Court's jurisdiction in this federal question case had been based on diversity of citizenship of the parties we would apply Pennsylvania's choice-of-law principles as the court was in the Eastern District of Pennsylvania. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 Sup. Ct. 1020 (1941). Accordingly, we look to Pennsylvania law to determine which state's law we should use in considering the unconscionability argument.

Applying Pennsylvania law, we recognized in Kruzits v. Okuma Machine Tool, Inc., 40 F.3d 52 (3d Cir. 1994), that "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." Id. at 55 (citing Smith v. Commonwealth Nat. Bank, 557 A.2d 775, 777 (Pa. Super. Ct. 1989)). In Kruzits, we noted that Pennsylvania courts have adopted section 187 of the Restatement (Second) Conflict of Laws, which provides that

30

choice-of-law provisions will be enforced:

> unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . .

Id. "Pennsylvania courts will uphold choice-of-law provisions in contracts to the extent that the transaction bears a reasonable relation to the chosen forum." Churchill Corp. v. Third Century, Inc., 578 A.2d 532, 537 (Pa. Super. Ct. 1990) (citing 13 Pa. Cons. Stat. Ann. § 1105(a) (West 1999) ("Except as otherwise provided in this section, when a transaction bears a reasonable relation to this Commonwealth and also to another state or nation the parties may agree that the law either of this Commonwealth or of such other state or nation shall govern their rights and duties.")).

Gay's Agreement states that she purchased services "provided by Intersections Inc.," which is "located in Chantilly, Virginia." J.A. at 98. Virginia therefore has a "substantial relationship" to Intersections. Inasmuch as we see no reason to conclude that Pennsylvania "has a materially greater interest" in the enforceability of the arbitration agreement, or that applying Virginia law to determine whether it should be enforced "would be contrary to a fundamental policy" of Pennsylvania, under Pennsylvania's choice-of-law rules we are satisfied that there is no reason not to honor the parties' choice of Virginia law in considering the unconscionability claim. Though it certainly is true that Pennsylvania has an interest in protecting its consumers, we cannot say that Virginia has a lesser interest in protecting businesses located in it. Thus, even if we adopt Gay's position that the arbitration provision is advantageous to Intersections, we see no reason not to honor the parties' choice of Virginia law to govern the terms of use of the Agreement. Overall, applying Pennsylvania

law for our selection of the applicable state law, we will apply Virginia law in considering the enforceability of the arbitration provision.

In reaching our conclusion that Virginia law applies we have not overlooked Gay's argument that the choice-of-law provision should not be enforced for two reasons. First, she contends that the provision governs only the "Terms of Use," and that the issue of whether the arbitration provision is enforceable does not arise from those terms of use. Appellant's reply br. at 12. But Gay's complaint undercuts her argument. After all, in her allegations she refers to those terms of use as "terms of the contract," and the choice-of-law provision appears in the "copy of the contract" that Gay includes as an exhibit to her complaint. J.A. at 79, 98. Indeed, we regard her argument on this point as being insubstantial. Plainly, as written, the choice-of-law provision pointing to Virginia law applies to her unconscionability argument.

Second, Gay argues that the choice-of-law provision itself is unconscionable because, "like the arbitration clause, [it] is buried in small print at the end of the contract drafted by a sophisticated party with superior bargaining power." Appellant's reply br. at 12. Under Pennsylvania law, however, a contract is not unconscionable simply because there is a disparity in bargaining power between the contracting parties, absent a showing that the terms were unreasonable. Witmer v. Exxon Corp., 434 A.2d 1222, 1228 (Pa. 1981). Gay fails to explain how the application of Virginia law, as opposed to Pennsylvania law, is so unreasonable that it invalidates the choice-of-law provision.

Inasmuch as we have determined that we should enforce the terms of use choice-of-law provision selecting the application of Virginia law, we consider whether the arbitration provision in the Agreement is unconscionable under that law.[14] We reiterate that the arbitration provision states:

---

[14]In considering the matter under Virginia law we are laying to one side the effect of the FAA. We point out, however, that as a matter of pure federal common law we see no reason to conclude that the arbitration provision is unconscionable.

32

> Any claim arising out of or relating to the Product shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association on an individual basis not consolidated with any other claim.

J.A. at 98. Gay argues that the arbitration provision is unconscionable because it was "drafted by Intersection[s] and lacking any choice on the part of Ms. Gay," and "bears all the earmarks of an unconscionable contract of adhesion . . . ." Appellant's br. at 19.

In describing unconscionability under Virginia law, the Supreme Court of Virginia has stated that:

> [w]hile the jurisdiction undoubtedly exists in the courts to avoid a contract on the ground that it makes an unconscionable bargain, nevertheless an inequitable and unconscionable bargain has been defined to be 'one that no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other.' The inequality must be so gross as to shock the conscience.

Mgmt. Enters., Inc. v. Thorncroft Co., 416 S.E.2d 229, 231 (Va. 1992) (quoting Smyth Bros.-McCleary-McClellan Co. v. Beresford, 104 S.E. 371, 382 (Va. 1920)). The doctrine "deals primarily with a grossly unequal bargaining power at the time the contract is formed . . . ." Envirotech Corp. v. Halco Eng'g, Inc., 364 S.E.2d 215, 220 (Va. 1988).

Although Gay surely did not have the same bargaining power as Intersections when she entered into the Agreement, she has not provided a basis for finding that the inequality in bargaining power was "so gross as to shock the conscience."

33

Mgmt. Enters., 416 S.E.2d at 231.[15]  Nor do the terms of the Agreement, namely to arbitrate disputes on  an individual basis, constitute an unconscionable bargain.  In Johnson, we observed that "even if plaintiffs who sign valid arbitration agreements lack the procedural right to proceed as part of a class, they retain the full

---

[15]Though we doubt that in the highly unlikely event that a consumer before entering into an agreement with Intersections attempted to negotiate to remove the arbitration provision she would have been successful, a consumer considering contracting with Intersections certainly could have decided to forego obtaining its services.  Without in any way besmirching its services, we cannot characterize them as something that a consumer must obtain from one source or another.  On the other hand, Gay seems not be burdened by the constraints we feel in characterizing the value of Intersections' services as she contends that credit repair "organizations are in reality, at least, mere letter writing services that . . . consumers would probably not retain . . . if they knew the truth."  Appellant br. at 8.

Furthermore, Gay has not demonstrated that only Intersections supplies services of the kind for which she contracted with it.  Quite to the contrary, she does not deny Intersections' assertion that there are other businesses that supply credit repair services.  See supra note 2.  In the circumstances, this case does not involve, in the words of Mitsubishi, "well supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract."  473 U.S. at 627, 105 S.Ct. at 3354 (internal quotation marks and citation omitted).  Furthermore, we can see no basis for a claim that the Agreement was the product of Intersections' fraud.  Moreover, we do not understand how a party can claim to be subject to overwhelming economic power when contracting for a service that costs only $4.99 a month and is available from more than one source and, in any event, she may not need as it may be essentially worthless.  Clearly, if Gay objected to the terms of the Agreement she could have walked away from it.  Thus, her position is different, for example, from that of a homeowner facing a mortgage foreclosure who accepts onerous refinancing terms in a desperate attempt to save her home.

range of rights" created by the relevant statute, and that "[t]hese rights remain available in individual arbitration proceedings." 225 F.3d at 373. Inasmuch as Gay retains her substantive rights pursuant to the CROA and the CSA, the terms of the arbitration agreement surely do not "shock the conscience." Mgmt. Enters., 416 S.E.2d at 231.

Moreover, even if we disregard the Agreement's choice-of-law provision and apply Pennsylvania law in considering the enforceability of the arbitration clause, as Gay urges us to do, we would reach the same result, largely because federal law requires that we do so and Pennsylvania law must conform with federal law. In discussing the doctrine of unconscionability under Pennsylvania law, we have stated that "'[u]nconscionability requires a two-fold determination: that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions.'" Harris, 183 F.3d at 181 (internal quotation marks and citations omitted).

Gay argues that the arbitration provision is unconscionable because she agreed to it at a time when she lacked any bargaining power to negotiate its terms, and the Agreement is one of adhesion. In Harris, however, we reiterated that "inequality of bargaining power, alone, is not a valid basis upon which to invalidate an arbitration agreement." Id. at 183. Moreover, she does not contend that she was under any compulsion to sign the Agreement.[16]

Gay argues with respect to its terms that the arbitration provision is unconscionable because it requires cases to proceed "on an individual basis not consolidated with any other claim," J.A. at 98, and therefore is "the functional equivalent of a denial of Ms. Gay's request to represent a class of similarly situated consumers." Appellant's br. at 14. In Johnson, however, we described the right to a class action as "merely a procedural one" pursuant to the Federal Rules of Civil Procedure, and stated that the right "may be waived." 225 F.3d at 369.

---

[16]See supra note 15.

We recognize that Gay has support for her claim that the arbitration provision is unconscionable in two Pennsylvania Superior Court cases, Lytle v. CitiFinancial Services, Inc., 810 A.2d 643 (Pa. Super. Ct. 2002), and Thibodeau v. Comcast Corp., 912 A.2d 874 (Pa. Super. Ct. 2006). In Lytle the Superior Court considered whether an arbitration provision in a loan agreement was unconscionable. The plaintiffs challenged several aspects of the provision, including a section that prohibited a consumer from bringing class action claims against the defendant. The Lytle court began its analysis by observing that "class actions are favored in this Commonwealth as a means of resolving many meritorious claims which would otherwise, due to the amounts involved, escape prosecution." 810 A.2d at 655. It noted that "[t]he arbitration provision at issue . . . specifically prohibits any use of or participation in a class action by the Lytles." Id. at 665-66. The Lytle court discussed our analysis in Johnson of whether the waiver of the right to class actions would undermine the public policy goals of the TILA. Id. at 666 (discussing Johnson, 225 F.3d at 374-75). The Lytle court concluded that the record before it was "devoid of any evidence that would establish that the damages claimed by appellants are insufficient to permit the Lytles to seek legal redress for their injuries in the absence of a class action," and remanded the case to the trial court to develop the record on that issue. Id.

In Thibodeau, 912 A.2d 874, the Superior Court considered whether a waiver of a right to class action contained in an arbitration agreement was unconscionable. There, the court described the reasons for encouraging class actions:

> Class action lawsuits are and remain the essential vehicle by which consumers may vindicate their lawful rights. The average consumer, having limited financial resources and time, cannot individually present minor claims in court or in an arbitration. Our justice system resolves this inherent inequality by creating the procedural device which allows consumers to join together and seek

36

redress for claims which would otherwise be impossible to pursue. Both the Federal and Pennsylvania Rules of Civil Procedure delineate specific rules for publicly selected trial court judges to actively manage class action lawsuits through the public judicial system.

Id. at 884-85 (quotations omitted). The court proceeded to discuss the federal and state rules providing for class actions, and continued:

It is only the class action vehicle which makes small consumer litigation possible. Consumers joining together as a class pool their resources, share the costs and efforts of litigation and make redress possible. Should the law require consumers to litigate or arbitrate individually, defendant corporations are effectively immunized from redress of grievances.

Id. at 885 (quotations omitted).[17] The court ultimately affirmed the trial court's ruling that the waiver of the right to a class action was unconscionable. Id. at 886.

Though the arbitration provisions in both Lytle and Thibodeau are distinguishable from the provision in this case, Gay

---

[17]The Thibodeau court certainly has had much judicial company in expressing its sentiments. It might be more evenhanded, however, also to recognize that a business such as Intersections which enters into transactions bringing it very small revenues under any particular contract, perhaps $39.92 in the case of Gay, has a legitimate reason to seek to avoid expensive litigation to resolve disputes with its customers and instead resolve its disputes less formally and probably less expensively in arbitration.

is correct that in both cases the Superior Court addressed the waiver of the right to bring a class action specifically, and found that such a provision would be unconscionable, Thibodeau, 912 A.2d at 886, if there are facts showing that "the costs associate[d] with individual versus class-based litigation of their claim against [the defendant] would . . . result in continuing immunity for [the defendant] for its wrongful acts," Lytle, 810 A.2d at 666. In doing so, the two Superior Court panels recognized that under Pennsylvania law, class actions are "favored," id. at 665, and are of "great public importance" as "the essential vehicle" for vindicating consumer rights, Thibodeau, 912 A.2d at 884.

But those cases are hardly the end point of our unconscionability analysis because we are concerned with the federal law that Congress set forth in the FAA; the federal law is controlling here and the Pennsylvania law must conform with it.[18] In Perry v. Thomas, 482 U.S. 483, 107 S.Ct. 2520 (1987), the Supreme Court explained how courts should reconcile the promotion of arbitration agreements with competing state interests:

> [T]he text of § 2 provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of [the FAA]: An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law, 'save upon such

---

[18]Of course, Lytle and Thibodeau are Superior Court cases and thus even if we were concerned with pure state law they would not bind us. See State Farm Mut. Auto. Ins. Co. v. Coviello, 233 F.3d 710, 713 (3d Cir. 2000). We hasten to add, however, that even if they were Pennsylvania Supreme Court cases our result would be the same. We also note that in a very different context from that here the Supreme Court of Pennsylvania has indicated that "[w]hile we believe that Lytle was well intentioned in its efforts to guard against pernicious lending practices, our conclusion is that it swept too broadly." Salley v. Option One Mort. Corp., 925 A.2d 115, 129 (Pa. 2006).

38

> grounds as exist at law or in equity for the revocation of <u>any</u> contract.' Thus state law, whether of legislative or judicial origin, is applicable <u>if</u> that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.

<u>Id.</u> at 492 n.9, 107 S.Ct. at 2527 n.9 (internal citations omitted). The Court distinguished state law principles that apply to contracts generally from those that are unique to arbitration agreements:

> A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. <u>See</u> <u>Prima Paint [Corp. v. Flood & Conklin Mfg. Co.</u>,] 388 U.S. [395,] 404, 87 S.Ct. [1801,] 1806 [(1967)]; <u>Southland Corp. v. Keating</u>, 465 U.S. [1,] 16-17[ ] n.11, 104 S.Ct. [852,] 861 [ ] n.11 (1984)]. A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.

<u>Id.</u>, 107 S.Ct. at 2527 n.9. The Court further admonished in a critical explanation that: "Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot. <u>Id.</u>, 107 S.Ct. at 2527 n.9.

Addressing the same competing interests that we face in this case, namely, the promotion of arbitration agreements and the protection of class actions prohibited by such agreements, we observed in <u>Johnson</u> that the FAA "reflects 'a liberal federal policy favoring arbitration agreements,'" <u>Johnson</u>, 225 F.3d at 376

(quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 24, 103 S.Ct. at 941), and that "[w]hatever the benefits of class actions, the FAA 'requires piecemeal resolution when necessary to give effect to an arbitration agreement,'" id. at 375 (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 20, 103 S.Ct. at 939). To the extent, then, that Lytle and Thibodeau hold that the inclusion of a waiver of the right to bring judicial class actions in an arbitration agreement constitutes an unconscionable contract, they are not based "upon such grounds as exist at law or in equity for the revocation of any contract" pursuant to section 2 of the FAA, and therefore cannot prevent the enforcement of the arbitration provision in this case. 9 U.S.C. § 2 (emphasis added).

Certainly the Pennsylvania Superior Court panels were aware of Perry and thought that they were reaching outcomes in considering the unconscionability issues consistent with it as well as other Supreme Court cases. We, however, reject Lytle and Thibodeau for we do not agree with them as there is no escape from the fact that they deal with agreements to arbitrate, rather than with contracts in general, and thus they are not in harmony with Perry. It would be sophistry to contend, in the words of Perry, that the Pennsylvania cases do not "rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable." 482 U.S. at 492 n.9, 107 S.Ct. at 2527 n.9. After all, though the Pennsylvania cases are written ostensibly to apply general principles of contract law, they hold that an agreement to arbitrate may be unconscionable simply because it is an agreement to arbitrate. A finding that the arbitration provisions in those cases are unconscionable can be reached only by parsing the provisions themselves to determine what they provide.

Overall, it is perfectly obvious that Gay relies on the uniqueness of the arbitration provision in framing her unconscionability argument. Nothing could be clearer because her argument is not predicated on a contention that Intersections misled her as to the Agreement's terms or forced her by some unlawful coercion to enter into it and accept the arbitration provision. Nor can she even fairly contend that she was under any compulsion to enter into the Agreement which she clearly views as having been essentially worthless to her. See supra note 15. Quite to the

contrary she contends that the provision is unconscionable because of what it provides, i.e., arbitration of disputes on an individual basis in place of litigation possibly brought on a class action basis. Thus, with all due respect to the Pennsylvania Superior Court, we will not apply state law as explicated in Lytle and Thibodeau and thereby interfere with the appropriate application of the FAA. The Commerce and Supremacy Clauses of the United States Constitution are implicated here. U.S. Const. art. I, § 8, cl.3; VI, cl. 2.

We cannot close our opinion without making one more observation about the Pennsylvania Superior Court cases. Clearly their reasoning with respect to the unconscionability of arbitration provisions can be applied to arbitration provisions in all sorts of contracts between vendors of goods and services on the one hand and consumers on the other hand. Thus, their reasoning if applied logically could result in a significant narrowing of the application of the FAA. We express no view on whether that might be a desirable result as it is not our function to do so. Rather, our obligation is to honor the intent of Congress and that is what we are doing. If the reach of the FAA is to be confined then Congress and not the courts should be the body to do so.

## V.  CONCLUSION

For the foregoing reasons, we conclude that Gay's claims are subject to arbitration, and that the arbitration provision in this case is not unconscionable. The District Court's order of June 29, 2006, to stay the proceedings and compel arbitration on an individual basis will be affirmed.

41